# MOTION PICTURE PATENTS COMPANY *v.* UNIVERSAL FILM MANUFACTURING COMPANY ET AL.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 715. Argued January 12, 15, 1917.—Decided April 9, 1917.

Under the patent law the grant by patent of the exclusive right to use, like the grant of the exclusive right to vend, is limited to the invention described in the claims of the patent, and that law does not empower the patent owner by notices attached to the things patented to extend the scope of the patent monopoly by restricting their use to materials necessary for their operation but forming no part of the patented invention, or to send such articles forth into the channels of trade subject to conditions as to use or royalty, to be imposed thereafter, in the vendor's discretion. *The Button-Fastener Case,* 77 Fed. Rep. 288, and *Henry* v. *Dick Company,* 224 U. S. 1, overruled.

In determining how far the owner of a patent may restrict the use after sale of machines embodying the invention, weight must be given to the rules long established that the scope of every patent is limited to the invention as described in the claims, read in the light of the specification, that the patentee receives nothing from the patent law beyond the right to restrain others from manufacturing, using or selling his invention, and that the primary purpose of that law is not to create private fortunes but is to promote the progress of science and the useful arts.

The extent to which the use of a patented machine may validly be restricted to specific supplies or otherwise by special contract between the owner of the patent and a purchaser or licensee, is a question outside of the patent law and not involved in this case.

235 Fed. Rep. 398, affirmed.

THE case is stated in the opinion.

*Mr. Melville Church* for petitioner:

The restrictions on the right to use the machine were fully brought home to the Prague Amusement Company

and were binding. This is settled by *Henry* v. *Dick Co.*, 224 U. S. 1, and no doubt is cast upon that case by *Bauer* v. *O'Donnell*, 229 U. S. 1, which did not involve the right to impose restrictions on use.

In the present case there were two distinct restrictions: First, that the machine should be used only with motion pictures leased from a manufacturer licensed by the plaintiff; and second, that the machine could not be used at all without compliance with terms previously fixed by the plaintiff. The first restriction is not repugnant to the Clayton Act of October 15, 1914, § 3, 38 Stat. 730; but even if it were, the lawfulness of the second restriction, which the Prague Company admittedly violated if it had notice, would not be affected. *Oregon R. & U. Co.* v. *Windsor*, 20 Wall. 64–72; *U. S. &c. Co.* v. *Griffen*, 126 Fed. Rep. 364–370. The two are independent and severable and the latter will support the plaintiff's right to exact a license agreement providing for a continuing royalty, which it might lawfully reserve and rely upon. *St. Paul Plow Works* v. *Sparling*, 140 U. S. 184. The $5.00 received from the licensed manufacturer was but a paltry $3\frac{1}{2}$ per cent. of the selling price, and utterly inadequate. The nameplate gave notice of the facts in relation to patent ownership and that restrictions were placed by the plaintiff upon the use. The Prague Company was under a duty to inquire of the Precision Machine Company the terms of the license under which the machine was put out, or to make like inquiry of the plaintiff. Inquiry of the former would have shown that the Precision Company was inhibited from selling except for use "upon other terms" to be fixed by the licensor and relating to the payment of royalty. The same information would have been obtained by inquiry of plaintiff. Either line of inquiry, properly followed up (*Shauer* v. *Alterton*, 151 U. S. 607–622; *Wood* v. *Carpenter*, 101 U. S. 135–141), would have revealed the details of these "other terms" and resulted in the fixing of a royalty

for use, to be paid only during use—a most reasonable arrangement.

Having failed to arrange for terms of royalty with the petitioner, the Prague Amusement Company never had a license to use and was and is, therefore, an infringer while using.

The distinction between the property rights conferred by patent and property rights in the machine, must be borne clearly in mind. The former are incorporeal, the latter corporeal, personal property. *De La Vergne Machine Co.* v. *Featherstone*, 147 U. S. 209–222. Under the patent laws, R. S. § 4898, the incorporeal rights are susceptible of infinite subdivision without impairment. Besides assignments and grants, the separate substantive, exclusive privileges of making, using, and selling may be parceled out by licenses with a wide variety of choice and combination as to time, place, method. Any such license may be granted for a lump sum or upon agreement for a continuing royalty. The patent owner can neither be required to make, use, or sell, nor to license others to do so. *Paper Bag Patent Case*, 210 U. S. 405, 425, 429. Upon a sale of the thing patented there is a transfer of the property in the thing itself but of only so much of the incorporeal patent rights as the owner chooses to relinquish. A sale outright without restriction passes both kinds of rights absolutely, but if, when selling, the patent owner restricts the purchaser's enjoyment of the incorporeal right of use conferred by the patent, any use by the purchaser beyond what is specifically authorized is an infringement upon the patent owner's reserved rights and may be restrained by the courts.

In the present case the machine proclaimed through the notice upon it that the right to use was restricted, and notified the purchaser to go to the plaintiff and make terms for the use, else it would be unlawful.

It is no objection that the notice itself did not state

the terms.  Plainly and unmistakably it showed that the machine was not free but under the domination of the named patent owner who must be applied to.  If the notice had been followed up, a reasonable royalty contract would have undoubtedly resulted.  In ignoring the notice out of a desire to escape any royalty, the purchaser took its chances of being stopped for infringement.

There is no question but that plaintiff's remedy is on the patent for the tort.  There was no contract.  Respondent, having deliberately refused to make one, is estopped to claim a contract or that the plaintiff has mistaken its remedy.

The liability of the other respondents is that of contributory infringers who knowingly coöperated in carrying on an unlicensed use.  All the respondents are jointly and severally liable in tort.  *Lovejoy* v. *Murray*, 3 Wall. 1–11; Walker on Patents, 4th ed., § 406, p. 343.

The patent in suit is valid.  Plaintiff is not estopped, as claimed, by proceedings in the Patent Office.

*Mr. Oscar W. Jeffery*, with whom *Mr. Edmund Wetmore* and *Mr. John B. Stanchfield* were on the brief, for respondents.

MR. JUSTICE CLARKE delivered the opinion of the court.

In this suit relief is sought against three defendant corporations as joint infringers of claim number seven of United States letters patent No. 707,934 granted to Woodville Latham, assignor, on August 26, 1902, for improvements in Projecting-Kinetoscopes.  It is sufficient description of the patent to say that it covers a part of the mechanism used in motion picture exhibiting machines for feeding a film through the machine with a regular, uniform and accurate movement and so as not to expose the film to excessive strain or wear.

The defendants in a joint answer do not dispute the title

of the plaintiff to the patent but they deny the validity of it, deny infringement, and claim an implied license to use the patented machine.

Evidence which is undisputed shows that the plaintiff on June 20, 1912, in a paper styled "License Agreement" granted to The Precision Machine Company a right and license to manufacture and sell machines embodying the inventions described and claimed in the patent in suit, and in other patents, throughout the United States, its territories and possessions. This agreement contains a covenant on the part of the grantee that every machine sold by it, except those for export, shall be sold "under the restriction and condition that such exhibiting or projecting machines shall be used solely for exhibiting or projecting motion pictures containing the inventions of reissued letters patent No. 12,192, *leased by a licensee of the licensor while it owns said patents, and upon other terms to be fixed* by the licensor and complied with by the user while the said machine is in use and *while the licensor owns said patents* (which other terms shall only be the payment of a royalty or rental to the licensor while in use)."

The grantee further covenants and agrees that to each machine sold by it, except for export, it will attach a plate showing plainly not only the dates of the letters patent under which the machine is "licensed," but also the following words and figures:

"Serial No.————.

"Patented.                                No.

"The sale and purchase of this machine gives only the right to use it solely with moving pictures containing the invention of reissued patent No. 12,192, leased by a licensee of the Motion Picture Patents Company, the owner of the above patents and reissued patent, while it owns said patents, and upon other terms to be fixed by the Motion Picture Patents Company and complied with by the user while it is in use and while the Motion Picture

Patents Company owns said patents. The removal or defacement of this plate terminates the right to use this machine."

The agreement further provides that the grantee shall not sell any machine at less than the plaintiff's list price, except to jobbers and others for purposes of resale and that it will require such jobbers and others to sell at not less than plaintiff's list price. The price fixed in the license contract for sale of machines after May 1st, 1909, is not less than $150 for each machine and the licensee agrees to pay a royalty of $5 on some machines and a percentage of the selling price on others.

It is admitted that the machine, the use of which is charged to be an infringement of the patent in suit, was manufactured by The Precision Machine Company and was sold and delivered under its "License Agreement" to the Seventy-second Street Amusement Company, then operating a playhouse on Seventy-second Street, in New York, and that when sold it was fully paid for and had attached to it a plate with the inscription which we have quoted as required by the agreement.

Reissued patent 12,192, referred to in the notice attached to the machine, expired on August 31, 1914. The defendant Prague Amusement Company on November 2, 1914, leased the Seventy-second Street playhouse from the Seventy-second Street Amusement Company, and acquired the alleged infringing machine as a part of the equipment of the leased playhouse. Subsequent to the expiration of reissued patent 12,192 the defendant, Universal Film Manufacturing Company, made two films or reels, which, between March 4th and 17th, 1915, were sold to the defendant the Universal Film Exchange and on March 17, 1915, were supplied to the defendant Prague Amusement Company for use on the machine, acquired as we have stated, and were used upon it at the Seventy-second Street playhouse on March 18th, 1915.

On January 18, 1915, the plaintiff sent a letter to the Seventy-second Street Amusement Company, notifying it in general terms that it was using without a license a machine embodying the invention of patent No. 707,934 and warning it that such use constituted an infringement of the patent, and on the same day the plaintiff addressed a letter to the defendant Universal Film Exchange notifying it that it also was infringing the same patents by supplying films for use upon the machine of the Seventy-second Street playhouse and elsewhere. The bill in this case was filed on March 18, 1915.

The District Court held that the limitation on the use of the machine attempted to be made by the notice attached to it, after it had been sold and paid for, was invalid, and that the Seventy-second Street Amusement Company, the purchaser, and its lessee, the Prague Amusement Company, had an implied license to use the machine as it had been used, and it dismissed the bill without passing on the question raised in the pleadings as to the validity of the patent. The Circuit Court of Appeals affirmed the District Court (235 Fed. Rep. 398) and the case is here for review on certiorari.

It was admitted at the bar that 40,000 of the plaintiff's machines are now in use in this country and that the mechanism covered by the patent in suit is the only one with which motion picture films can be used successfully.

This state of facts presents two questions for decision:

First. May a patentee or his assignee license another to manufacture and sell a patented machine and by a mere notice attached to it limit its use by the purchaser or by the purchaser's lessee, to films which are no part of the patented machine, and which are not patented?

Second. May the assignee of a patent, which has licensed another to make and sell the machine covered by it, by a mere notice attached to such machine, limit the

use of it by the purchaser or by the purchaser's lessee to terms not stated in the notice but which are to be fixed, after sale, by such assignee in its discretion?

It is obvious that in this case we have presented anew the inquiry, which is arising with increasing frequency in recent years, as to the extent to which a patentee or his assignee is authorized by our patent laws to prescribe by notice attached to a patented machine the conditions of its use and the supplies which must be used in the operation of it, under pain of infringement of the patent.

The statutes relating to patents do not provide for any such notice and it can derive no aid from them. Revised Statutes, § 4900, requiring that patented articles shall be marked with the word "Patented" affects only the damages recoverable for infringement, *Dunlap* v. *Schofield,* 152 U. S. 244, and Rev. Stats., § 4901, protects by its penalties the inventor, but neither one contemplates the use of such a "License Notice" as we have here and whatever validity it has must be derived from the general and not from the patent law.

The extent to which the use of the patented machine may validly be restricted to specific supplies or otherwise by special contract between the owner of a patent and the purchaser or licensee is a question outside the patent law and with it we are not here concerned. *Keeler* v. *Standard Folding Bed Co.,* 157 U. S. 659.

The inquiry presented by this record, as we have stated it, is important and fundamental, and it requires that we shall determine the meaning of Congress when in Rev. Stats., § 4884, it provided that "Every patent shall contain . . . a grant to the patentee, his heirs or assigns, for the term of seventeen years, *of the exclusive right to* make, *use,* and vend *the invention or discovery* throughout the United States, and the Territories thereof." We are concerned only with the right to "use," authorized to be granted by this statute, for it is under warrant of this

right only that the plaintiff can and does claim validity for its warning notice.

The words used in the statute are few, simple and familiar, they have not been changed substantially since they were first used in the Act of 1790, c. 7, 1 Stat. 109; *Bauer* v. *O'Donnell*, 229 U. S. 1, 9, and their meaning would seem not to be doubtful if we can avoid reading into them that which they really do not contain.

In interpreting this language of the statute it will be of service to keep in mind three rules long established by this court, applicable to the patent law and to the construction of patents, viz:

1st. The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification. These so mark where the progress claimed by the patent begins and where it ends that they have been aptly likened to the description in a deed, which sets the bounds to the grant which it contains. It is to the claims of every patent, therefore, that we must turn when we are seeking to determine what the invention is, the exclusive use of which is given to the inventor by the grant provided for by the statute,—"He can claim nothing beyond them." *Keystone Bridge Co.* v. *Phœnix Iron Co.*, 95 U. S. 274; *Railroad Co.* v. *Mellon*, 104 U. S. 112, 118; *Yale Lock Mfg. Co.* v. *Greenleaf*, 117 U. S. 554, 559; *McClain* v. *Ortmayer*, 141 U. S. 419, 424.

2nd. It has long been settled that the patentee receives nothing from the law which he did not have before, and that the only effect of his patent is to restrain others from manufacturing, using or selling that which he has invented. The patent law simply protects him in the monopoly of that which he has invented and has described in the claims of his patent. *United States* v. *American Bell Telephone Co.*, 167 U. S. 224, 239; *Paper Bag Patent Case*, 210 U. S. 405, 424; *Bauer* v. *O'Donnell*, 229 U. S. 1, 10.

3rd. Since *Pennock* v. *Dialogue*, 2 Pet. 1, was decided in

1829 this court has consistently held that the primary purpose of our patent laws is not the creation of private fortunes for the owners of patents but is "to promote the progress of science and useful arts" (Constitution, Art. I, § 8), an object and purpose authoritatively expressed by Mr. Justice Story, in that decision, saying:

"While one great object [of our patent laws] was, by holding out a reasonable reward to inventors, and giving them an exclusive right to their inventions for a limited period, to stimulate the efforts of genius; the main object was 'to promote the progress of science and useful arts.'"

Thirty years later this court, returning to the subject, in *Kendall* v. *Winsor*, 21 How. 322, again pointedly and significantly says:

"It is undeniably true, that the limited and temporary monopoly granted to inventors was never designed for their exclusive profit or advantage; the benefit to the public or community at large was another and doubtless the primary object in granting and securing that monopoly."

This court has never modified this statement of the relative importance of the public and private interests involved in every grant of a patent, even while declaring that in the construction of patents and the patent laws, inventors shall be fairly, even liberally, treated. *Grant* v. *Raymond*, 6 Pet. 218, 241; *Winans* v. *Denmead*, 15 How. 330; Walker on Patents, § 185.

These rules of law make it very clear that the scope of the grant which may be made to an inventor in a patent, pursuant to the statute, must be limited to the invention described in the claims of his patent (104 U. S. 118, *supra*) and to determine what grant may lawfully be so made we must hold fast to the language of the act of Congress providing for it, which is found in two sections of the Revised Statutes. Section 4886 provides that "Any person who has invented or discovered any new and useful art, ma-

chine, manufacture or composition of matter, or any new
and useful improvement thereof, . . . may . . .
obtain a patent therefor"; and § 4884 provides that such
patent when obtained "shall contain . . . a grant to
the patentee, his heirs or assigns . . . of the exclusive
right to . . . use . . . the invention or dis-
covery."

Thus the inventor may apply for, and, if he meets the
required conditions, may obtain, a patent for the new and
useful invention which he has discovered, which patent
shall contain a grant of the right to the exclusive use of his
discovery.

Plainly, this language of the statute and the established
rules to which we have referred restrict the patent granted
on a machine, such as we have in this case, to the mech-
anism described in the patent as necessary to produce
the described results. It is not concerned with and has
nothing to do with the materials with which or on which
the machine operates. The grant is of the exclusive right
to use the mechanism to produce the result with any
appropriate material, and the materials with which the
machine is operated are no part of the patented machine
or of the combination which produces the patented re-
sult. The difference is clear and vital between the exclu-
sive right to use the machine which the law gives to the
inventor and the right to use it exclusively with prescribed
materials to which such a license notice as we have here
seeks to restrict it. The restrictions of the law relate to the
useful and novel features of the machine which are de-
scribed in the claims of the patent, they have nothing to
do with the materials used in the operation of the ma-
chine; while the notice restrictions have nothing to do with
the invention which is patented but relate wholly to the
materials to be used with it. Both in form and in sub-
stance the notice attempts a restriction upon the use of
the supplies only and it cannot with any regard to pro-

priety in the use of language be termed a restriction upon the use of the machine itself.

Whatever right the owner may have to control by restriction the materials to be used in operating the machine must be derived through the general law from the ownership of the property in the machine and it cannot be derived from or protected by the patent law, which allows a grant only of the right to an exclusive use of the new and useful discovery which has been made—this and nothing more.

This construction gives to the inventor the exclusive use of just what his inventive genius has discovered. It is all that the statute provides shall be given to him and it is all that he should receive, for it is the fair as well as the statutory measure of his reward for his contribution to the public stock of knowledge. If his discovery is an important one his reward under such a construction of the law will be large, as experience has abundantly proved, and if it be unimportant he should not be permitted by legal devices to impose an unjust charge upon the public in return for the use of it. For more than a century this plain meaning of the statute was accepted as its technical meaning, and that it afforded ample incentive to exertion by inventive genius is proved by the fact that under it the greatest inventions of our time, teeming with inventions, were made. It would serve no good purpose to amplify by argument or illustration this plain meaning of the statute. It is so plain that to argue it would obscure it.

It was not until the time came in which the full possibilities seem first to have been appreciated of uniting, in one, many branches of business through corporate organization and of gathering great profits in small payments, which are not realized or resented, from many, rather than smaller or even equal profits in larger payments, which are felt and may be refused, from a few, that it came to be thought that the "right to use . . . the invention"

of a patent gave to the patentee or his assigns the right
to restrict the use of it to materials or supplies not de-
scribed in the patent and not by its terms made a part
of the thing patented.

The construction of the patent law which justifies as
valid the restriction of patented machines, by notice, to
use with unpatented supplies necessary in the operation
of them, but which are no part of them, is believed to have
originated in *Heaton-Peninsular Button-Fastener Co.* v.
*Eureka Specialty Co.,* 77 Fed. Rep. 288 (which has come
to be widely referred to as the *Button-Fastener Case*),
decided by the Circuit Court of Appeals of the Sixth
Circuit in 1896. In this case the court, recognizing the
pioneer character of the decision it was rendering, speaks
of the "novel restrictions" which it is considering and says
that it is called upon "to mark another boundary line
around the patentee's monopoly, which will *debar him
from engrossing the market for an article not the subject
of a patent,*" which it declined to do.

This decision proceeds upon the argument that, since
the patentee may withold his patent altogether from pub-
lic use he must logically and necessarily be permitted to
impose any conditions which he chooses upon any use
which he may allow of it. The defect in this thinking
springs from the substituting of inference and argument
for the language of the statute and from failure to distin-
guish between the rights which are given to the inventor
by the patent law and which he may assert against all the
world through an infringement proceeding and rights
which he may create for himself by private contract
which, however, are subject to the rules of general as dis-
tinguished from those of the patent law. While it is true
that under the statutes as they were (and now are) a
patentee might withhold his patented machine from pub-
lic use, yet if he consented to use it himself or through
others, such use immediately fell within the terms of the

statute and as we have seen he is thereby restricted to the use of the invention as it is described in the claims of his patent and not as it may be expanded by limitations as to materials and supplies necessary to 'the operation of it imposed by mere notice to the public.

The high standing of the court rendering this decision and the obvious possibilities for gain in the method which it approved led to an immediate and widespread adoption of the system, in which these restrictions expanded into more and more comprehensive forms until at length the case at bar is reached, with a machine sold and paid for yet claimed still to be subject not only to restriction as to supplies to be used but also subject to any restrictions or conditions as to use or royalty which the company which authorized its sale may see fit, after the sale, from time to time to impose. The perfect instrument of favoritism and oppression which such a system of doing business, if valid, would put into the control of the owner of such a patent should make courts astute, if need be, to defeat its operation. If these restrictions were sustained plainly the plaintiff might, for its own profit or that of its favorites, by the obviously simple expedient of varying its royalty charge, ruin anyone unfortunate enough to be dependent upon its confessedly important improvements for the doing of business.

Through the twenty years since the decision in the *Button-Fastener Case* was announced there have not been wanting courts and judges who have dissented from its conclusions, as is sufficiently shown in the division of this court when the question involved first came before it in *Henry* v. *Dick Co.*, 224 U. S. 1, and in the disposition shown not to extend the doctrine in *Bauer* v. *O'Donnell*, 229 U. S. 1.

The exclusive right to "vend" a patented article is derived from the same clause of the section of the statute which gives the exclusive right to "use" such an article

and following the decision of the *Button-Fastener Case,* it was widely contended as obviously sound, that the right existed in the owner of a patent to fix a price at which the patented article might be sold and resold under penalty of patent infringement. But this court, when the question came before it in *Bauer* v. *O'Donnell,* 229 U. S. 1, rejecting plausible argument and adhering to the language of the statute from which all patent right is derived, refused to give such a construction to the act of Congress, and decided that the owner of a patent is not authorized by either the letter or the purpose of the law to fix, by notice, the price at which a patented article must be sold after the first sale of it, declaring that the right to vend is exhausted by a single, unconditional sale, the article sold being thereby carried outside the monopoly of the patent law and rendered free of every restriction which the vendor may attempt to put upon it. The statutory authority to grant the exclusive right to "use" a patented machine is not greater, indeed it is precisely the same, as the authority to grant the exclusive right to "vend," and, looking to that authority, for the reasons stated in this opinion we are convinced that the exclusive right granted in every patent must be limited to the invention described in the claims of the patent and that it is not competent for the owner of a patent by notice attached to its machine to, in effect, extend the scope of its patent monopoly by restricting the use of it to materials necessary in its operation but which are no part of the patented invention, or to send its machines forth into the channels of trade of the country subject to conditions as to use or royalty to be paid to be imposed thereafter at the discretion of such patent owner. The patent law furnishes no warrant for such a practice and the cost, inconvenience and annoyance to the public which the opposite conclusion would occasion forbid it.

It is argued as a merit of this system of sale under a

license notice that the public is benefited by the sale of the machine at what is practically its cost and by the fact that the owner of the patent makes its entire profit from the sale of the supplies with which it is operated. This fact, if it be a fact, instead of commending, is the clearest possible condemnation of, the practice adopted, for it proves that under color of its patent the owner intends to and does derive its profit, not from the invention on which the law gives it a monopoly but from the unpatented supplies with which it is used and which are wholly without the scope of the patent monopoly, thus in effect extending the power to the owner of the patent to fix the price to the public of the unpatented supplies as effectively as he may fix the price on the patented machine.

We are confirmed in the conclusion which we are announcing by the fact that since the decision of *Henry* v. *Dick Co.*, 224 U. S. 1, the Congress of the United States, the source of all rights under patents, as if in response to that decision, has enacted a law making it unlawful for any person engaged in interstate commerce "to lease or make a sale or contract for sale of goods . . . machinery, supplies or other commodities, *whether patented or unpatented*, for use, consumption or resale . . . or fix a price charged therefor . . . on the condition, agreement or understanding that the lessee or purchaser thereof shall not use . . . the goods . . . machinery, supplies or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 38 Stat. 730.

Our conclusion renders it unnecessary to make the application of this statute to the case at bar which the Circuit Court of Appeals made of it but it must be accepted by us as a most persuasive expression of the public

policy of our country with respect to the question before us.

It is obvious that the conclusions arrived at in this opinion are such that the decision in *Henry* v. *Dick Co.*, 224 U. S. 1, must be regarded as overruled.

Coming now to the terms of the notice attached to the machine sold to the Seventy-second Street Amusement Company under the license of the plaintiff and to the first question as we have stated it.

This notice first provides that the machine, which was sold to and paid for by the Amusement Company may be used only with moving picture films containing the invention of reissued patent No. 12,192, so long as the plaintiff continues to own this reissued patent.

Such a restriction is invalid because such a film is obviously not any part of the invention of the patent in suit; because it is an attempt, without statutory warrant, to continue the patent monopoly in this particular character of film after it has expired, and because to enforce it would be to create a monopoly in the manufacture and use of moving picture films, wholly outside of the patent in suit and of the patent law as we have interpreted it.

The notice further provides that the machine shall be used only upon other terms (than those stated in the notice) to be fixed by the plaintiff, while it is in use and while the plaintiff "owns said patents." And it is stated at the bar that under this warrant a charge was imposed upon the purchaser graduated by the size of the theater in which the machine was to be used.

Assuming that the plaintiff has been paid an average royalty of $5 on each machine sold, prescribed in the license agreement, it has already received over $200,000 for the use of its patented improvement, which relates only to the method of using the films which another had invented, and yet it seeks by this device to collect during the life of the patent in suit what would doubtless aggre-

MOTION PICTURE CO. *v.* UNIVERSAL FILM CO. 519

243 U. S.    HOLMES, McKENNA, and VAN DEVANTER, JJ., dissenting.

gate many times this amount for the use of this same invention, after its machines have been sold and paid for.

A restriction which would give to the plaintiff such a potential power for evil over an industry which must be recognized as an important element in the amusement life of the nation, under the conclusions we have stated in this opinion, is plainly void, because wholly without the scope and purpose of our patent laws and because, if sustained, it would be gravely injurious to that public interest, which we have seen is more a favorite of the law than is the promotion of private fortunes.

Both questions as stated must be answered in the negative and the decree of the Circuit Court of Appeals is

*Affirmed.*

MR. JUSTICE McREYNOLDS concurs in the result.

MR. JUSTICE HOLMES, dissenting.

I suppose that a patentee has no less property in his patented machine than any other owner, and that in addition to keeping the machine to himself the patent gives him the further right to forbid the rest of the world from making others like it. In short, for whatever motive, he may keep his device wholly out of use. *Continental Paper Bag Co.* v. *Eastern Paper Bag Co.*, 210 U. S. 405, 422. So much being undisputed, I cannot understand why he may not keep it out of use unless the licensee, or, for the matter of that, the buyer, will use some unpatented thing in connection with it. Generally speaking the measure of a condition is the consequence of a breach, and if that consequence is one that the owner may impose unconditionally, he may impose it conditionally upon a certain event. *Ashley* v. *Ryan*, 153 U. S. 436, 443. *Lloyd* v. *Dollison*, 194 U. S. 445, 449. *Non debet, cui plus licet, quod minus est non licere.* D. 50, 17, 21.

No doubt this principle might be limited or. excluded in cases where the condition tends to bring about a state of things that there is a predominant public interest to prevent. But there is no predominant public interest to prevent a patented tea pot or film feeder from being kept from the public, because, as I have said, the patentee may keep them tied up at will while his patent lasts. Neither is there any such interest to prevent the purchase of the tea or films, that is made the condition of the use of the machine. The supposed contravention of public interest sometimes is stated as an attempt to extend the patent law to unpatented articles, which of course it is not, and more accurately as a possible domination to be established by such means. But the domination is one only to the extent of the desire for the tea pot or film feeder, and if the owner prefers to keep the pot or the feeder unless you will buy his tea or films, I cannot see in allowing him the right to do so anything more than an ordinary incident of ownership, or at most, a consequence of the *Paper Bag Case*, on which, as it seems to me, this case ought to turn. See *Grant* v. *Raymond*, 6 Pet. 218, 242.

Not only do I believe that the rule that I advocate is right under the *Paper Bag Case*, but I think that it has become a rule of property that law and justice require to be retained. For fifteen years, at least since *Bement* v. *National Harrow Co.*, 186 U. S. 70, 88–93, if not considerably earlier, the public has been encouraged by this court to believe that the law is as it was laid down in *Heaton-Peninsular Button-Fastener Co.* v. *Eureka Specialty Co.*, 77 Fed. Rep. 288, 25 C. C. A. 267, and numerous other decisions of the lower courts. I believe that many and important transactions have taken place on the faith of those decisions, and that for that reason as well as for the first that I have given, the rule last announced in *Henry* v. *Dick Co.*, 224 U. S. 1, should be maintained.

I will add for its bearing upon *Straus* v. *Victor Talking*

*Machine Co., ante*, 490, that a conditional sale retaining the title until a future event after delivery, has been decided to be lawful again and again by this court. *Bailey* v. *Baker Ice Machine Co.*, 239 U. S. 268, 272. I confine myself to expressing my views upon the general and important questions upon which I have the misfortune to differ from the majority of the court. I leave on one side the question of the effect of the Clayton Act, as the court has done, and also what I might think if the *Paper Bag Case* were not upheld, or if the question were upon the effect of a combination of patents such as to be contrary to the policy that I am bound to accept from the Congress of the United States.

MR. JUSTICE MCKENNA and MR. JUSTICE VAN DEVANTER concur in this dissent.