**AMERICAN EQUIPMENT CO. v. TUTHILL
BLDG. MATERIAL CO.**

No. 4948.

Circuit Court of Appeals, Seventh Circuit.
Feb. 1, 1934.

Rehearing Denied Feb. 28, 1934.

Morris Townley, of Chicago, Ill., for appellant.

Francis X. Busch and James A. Sprowl, both of Chicago, Ill., for appellee.

Before EVANS, SPARKS, and PAGE, Circuit Judges.

EVANS, Circuit Judge.

Appellant brought suit for an accounting of royalties alleged to have accrued to it under a license agreement executed by it, as the owner of certain patents, to appellee. The latter defended on the ground that the contract violated the Anti Monopoly Law of the State of Illinois (Smith-Hurd Rev. St. Ill. 1933, c. 38, § 569 et seq.) and the Sherman Anti-Trust Law (15 USCA §§ 1–7, 15 note). The cause was referred to a master, whose findings of fact favored appellee. The substance of such findings is herewith set forth.

Appellant, the owner of certain patents described as brick setting machines and brick loading forks, entered into a license contract with appellee which recited that licenses to use such machines had been issued to five other companies engaged in brick manufacturing in the vicinity of Chicago. Appellee could, under its license, use the machine only at its brick yard at 138th Street and Racine Avenue, and it was further limited to the manufacture during each month of five per cent. of the total number of brick manufactured and delivered during said month by the five mentioned licensees. Appellee agreed to pay, as rental for said brick setting machine and as royalty for the license granted, on the fifteenth day of each calendar month, the sum of thirty cents for each thousand brick manufactured and delivered by appellee from its yard. In case appellee sold a greater quan-

tity of brick than the output of its yard, it agreed to procure such excess from another licensee, and, in the event that it delivered a quantity of brick in excess of its quota, it agreed to pay appellant, in addition to the thirty cents per thousand brick, an additional sum of $1.50 per thousand upon the excess brick so delivered. If it continued to deliver brick in excess of its quota from month to month, the sum to be paid was $3 per thousand; and in the event appellee could not deliver brick to the limit of its quota, appellant agreed to use its best efforts to procure sufficient additional orders to make up the deficiency and, in the event of its failure so to do, to pay to appellee the sum of $1.50 per thousand on the difference between the quantity of brick manufactured and delivered and the full quantity for which appellee was licensed to use said machines.

During 1929, appellee manufactured and delivered from its yard 36,000,000 common brick. During the same year the five other licensees manufactured and delivered 498,-000,000 brick. In 1930 and 1931, appellee sold more than its quota by several million brick.

The use of the patented machinery in no way affected the shape, size, hardness, or color of the finished brick. The machines performed no function which could not be done by hand. All brick was fully shaped and dried in a separate building before any of the patented machines were used. The sole function of said machinery was to help move and lift as a unit a small load of fully formed and dried brick a few feet from a small car into the burning kiln and also to remove the brick in stacked units from the kiln to the cars after the burning operation was completed. In other words, appellant's patented machines dealt only with the mechanical handling of the brick.

On October 31, 1930, appellant elected to exercise its right to increase the additional sums of royalties payable from appellee from $1.50 per thousand brick to $3 per thousand brick.

From the execution of the contract down to the time the suit was begun, appellee paid the royalty of thirty cents per thousand on all brick by it made and delivered.

The handling of brick by machinery manufactured under the patents above mentioned was limited to the metropolitan area around New York, Chicago, and a single brick company in Milwaukee. Because of the low value of brick in proportion to its bulk and the correspondingly high freight or motor truck-

ing rates, brick is not customarily shipped more than fifty or sixty miles from the point of origin, and practically all brick used in the Chicago area is manufactured within sixty miles of the Cook County Courthouse. During the last fifteen years the licensees of appellant have manufactured and delivered ninety per cent. of all the common brick used in the Chicago territory.

The brick manufacturing industry in the Chicago area from 1900 to 1909 at times experienced keen competition and at other times was controlled by pools or combines with the result that the prices varied from $3.75 to $10 per thousand. Various efforts were made to eliminate competition and stabilize the price, and on one occasion these efforts resulted in successful criminal prosecutions instituted against the Chicago brick manufacturers on the charge that they were violating the anti-trust laws.

In 1909, one Penfield, president of appellant, negotiated with the various brick manufacturers and represented to them that through the use of the patented brick setting machines both the output and the price of brick in the Chicago area could be legally controlled. The license agreements provided a price of $6 per thousand in the Chicago area for wagon deliveries, but in 1925 the provision fixing the price at which the brick was to be sold was eliminated.

Before fixing the various manufacturing quotas, appellant sent to the yards of the various Chicago brick companies investigators who went over the books and, as the result thereof, determined the quotas, which varied from 52% to 2.6%. The 1914 contract modified the quotas somewhat. In 1916, appellee company was organized. Its promoter was offered $50,000 if he would stay out of the field. Appellee, however, proceeded and, upon representation that the output of competing companies could be regulated, took a license, and its quota of the brick manufactured in the area was fixed at 5%. Appellant advanced $14,000 for the alteration of appellee's brick yard as an inducement to appellee to sign the license agreement. The debt was canceled when the royalty payments reached said sum.

A market price of $12 per thousand was maintained from September, 1921, to May, 1931, all licensees maintaining this price for the entire period. During this period the prices of material from which brick was made varied widely and fluctuated continually in the Chicago market.

Each brick company entering into a li-

cense agreement rendered a monthly report to appellant showing the number of bricks delivered, and each contracting party was permitted to examine the report on file with appellant to see whether the licensees lived up to their agreements. From 1909 to 1930, the license agreements were enforced by the various licensees' complying with the quota or paying penalty for the deviation. The use of appellant's patented machines resulted in savings and economies to the user thereof. No attack on the validity of the patents was made.

The trial court filed a carefully prepared opinion, the substance of which is embodied in the following:

"The conclusion is inescapable that the plaintiff and its licensees, including the defendant, were engaged in a conspiracy to violate the criminal laws of the United States as well as the State of Illinois. Its plans are 'liveried in legal form,' but its history and its practice sheds a light which shows the parties naked before the law, and they may be seen as they actually exist working in a conspiracy in restraint of trade and to control prices. Plaintiff cannot have the aid of this Court to enforce the penalties provided for in its contract, and designed to make effective the conspiracy the licensor and licensees were engaged in.

"The Illinois statute makes this contract void, and since the record shows that shipments were made out of the state the Sherman Anti-Trust Law was violated. A court of equity will refuse its aid to the parties involved for a much higher moral reason in that it will not undertake to adjudicate the rights of parties who have been engaged in an enterprise outside of the law, and will leave the parties where it found them.

"There are no equities in favor of the defendant. By its own position it stands convicted before the law, and for that reason it will not be awarded costs."

The determination of soundness of the District Court's conclusion turns upon the effect to be given to the so-called license agreement.

■ To narrow the issue it may be well to state those propositions over which there can be no dispute. The owner of a valid patent is the possessor of a seventeen year legal monopoly granted to him by the United States Government. Such a patentee or his assignee has for said seventeen years the exclusive right to make, sell, and use the patented article or the patented process. He may ex-

clude the entire population of the United States from making, selling, or using the article covered by the patent. He may assign the patent in whole or in part. The right to exclude all carries with it the lesser right to exclude a part of said population and to permit another or others to make, sell, or use the patent for a limited period or in a limited territory.

Appellant's right to license one, or as many as it chooses, to make, sell or use the patented machine in the Chicago area was clear. It could prefer large manufacturers or small producers. The licensees, thus selected, might through their combined production make and sell (as here) all, or nearly all, the products covered by the patent. The size of output or percentage of total output produced by licensees has no bearing on patentee's right to license. In short, the patentee may exclude all from making, selling, or using his patent in the United States, and this carries with it the right to exclude some and license others. As far as the contract in question deals with the exercise of the patentee's recognized legal monopoly, it is not subject to the prohibitive provisions of the antitrust laws.

■■ In selecting his licensees, the patentee may, as he doubtless would ordinarily, look to the possible royalty returns. He may require minimum royalty payments. He may limit the number or amount of patented articles the licensee may make. Likewise, to secure the maximum royalty return he may require the licensee to use the patented process exclusively or make only the patented articles, if it manufactures such articles.

There are, however, agreements which, though they deal with patent grants and patent rights, yet in other respects transcend the field covered by the lawful monopoly and are void if they violate the antitrust laws.

In so far as such agreements are license agreements, they are unobjectionable; to the extent that they are not license agreements, they are subject to the inhibitions of the Sherman Anti-Trust Law (15 USCA §§ 1–7, 15 note).

Appellant relies largely upon Rubber Tire Wheel Co. v. Milwaukee Rubber Works, 154 F. 358, decided by this court in 1907. This decision, however, must be read in the light of, and as modified by, later decisions of the Supreme Court. Standard Oil Co. v. United States, 283 U. S. 163, 51 S. Ct. 421, 75 L. Ed. 926; Carbice Corp. v. American Patents Development Corporation, 283 U. S. 27, 51 S.

Ct. 334, 75 L. Ed. 819; Motion Picture Patents Co. v. Universal Film Manufacturing Co., 243 U. S. 502, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959; United States v. General Electric Co., 272 U. S. 476, 47 S. Ct. 192, 71 L. Ed. 362.

■ A patentee in licensing another as its agent to sell *the patented article* may lawfully impose the condition that sales by the licensee shall be at a price fixed by the licensor. United States v. General Electric Co., 272 U. S. 476, 47 S. Ct. 192, 71 L. Ed. 362.

■■ The owner of a patent which covers a process or a machine for making an *unpatented* article, however, may not fix the price at which the article shall be sold. Motion Picture Patents Co. v. Universal Film Manufacturing Co., 243 U. S. 502, 37 S. Ct. 416, 61 L. Ed. 871, L. R. A. 1917E, 1187, Ann. Cas. 1918A, 959. Nor can license agreements, which contain selling price provisions for non-patented articles, avoid the penalties of the Sherman Anti-Trust Law because valid patent license provisions also appear in the agreements.

■ If an unreasonable restraint upon interstate commerce be the result of the provisions which fix the price of an unpatented article in agreements made by a patentee and licensees who make a large part of said unpatented articles in a certain section of or throughout the United States, the agreements are within the condemnation of the Act and are void.

Such is the situation of the parties to the contract in this case. The brick manufacturers who signed the agreement made ninety per cent. of the bricks used in Chicago. Brick was an *unpatented* article; that is to say, no patent in the license agreement or any other patent covered the article—ordinary brick. The agreement, so far as it licensed the use of the patented machine or device used to make brick, was unobjectionable. It was an exercise of a right given the patentee by his patent grant. In so far as it fixed, curtailed, and allotted the number of brick which each licensee could make, however, the agreement was subject to the anti-trust laws of the State of Illinois and the United States. The imposition of the so-called penalty royalties, in case more bricks than were allotted to one licensee were manufactured, was not a license provision, but was a price fixing, quantity production limitation, the inevitable result of which was the unreasonable restraint of commerce and the creation of a monopoly. Even though no price at which the unpatented brick might be sold was fixed in the agreement, the purpose, object, and inevitable result of said royalty provision were to control the production and therefore the price of the unpatented article. The royalty provision to the effect that the amount of the royalty should be determined by the quantity of the unpatented article produced, and would be multiplied if more than a certain percentage of the entire production were manufactured, is obviously a price fixing, quantity production agreement. The contention of counsel that it was nothing more than an exercise of the right of a patentee to select his licensees and limit the use which each might make of the patented article, we cannot accept.

The oral testimony of different witnesses, who spoke for different licensees, leaves no doubt as to the intent of the contracting parties. They entered into the agreement to control prices and regulate the number of brick each should manufacture, not to secure the advantages which flowed from the use of the patented machines or article. It is possible that both results were desired, but the dominant thought, purpose, and plan were to control brick production and brick prices in the Chicago area.

The following facts are determinative of the invalidity of the contract. The finished product, viz., brick, was an unpatented article. The manufacturers who took license contracts produced ninety per cent. of the brick used in the Chicago vicinity. Shipments of brick from outside areas to Chicago were impossible because of the bulk and weight of the article and the high cost of transportation. In addition to the permissible license agreement, the parties contracted to control the output of manufactured brick and the prices at which it was to be sold. The combination of these facts brings the case within the condemnation of the antitrust acts of the state and Federal government. Standard Sanitary Manufacturing Co. v. United States, 226 U. S. 20, 33 S. Ct. 9, 57 L. Ed. 107.

■ The illegal provisions so permeate the contract that a court cannot separate and uphold the legal provisions appearing therein. The entire contract is therefore void.

The judgment is

Affirmed.