## TODD v. GREAT WESTERN SUGAR CO.

### No. 349.

District Court, D. Nebraska, Omaha Division.

Oct. 15, 1943.

Neighbors & Danielson, of Scottsbluff, Neb., for plaintiff.

Van Cise, Robinson & Charlton, of Denver, Colo., Mothersead & Wright, of Scottsbluff, Neb., and William B. King, of Denver, Colo., for defendant.

DONOHOE, District Judge.

In the year 1926, letters patent were granted to Emery W. Todd by the United States Patent Office for improvements in a liquid testing apparatus, and later in 1928, a second letters patent were allowed as an improvement over the first.

On February 16th, 1940, Mr. Todd, as plaintiff, commenced this action in the North Platte Division of this District, against the defendant, Great Western Sugar Company, in which the defendant is charged with infringing the letters patent issued to the plaintiff, and praying for an injunction and an accounting. The defendant answered denying any infringement, and as an additional defense averred that the letters patent granted to the plaintiff were invalid and void. Thereafter, by written stipulation, the cause was transferred from the North Platte Division to the Omaha Division of this District, where the action was tried and submitted upon issues involved, as follows:

1. Has the defendant infringed plaintiff's patents?

2. Are the plaintiff's patents invalid?

We shall first consider the question of infringement, and in approaching this question, it is necessary to examine the explanation and principle of the machine patented by the plaintiff, which he claims is being infringed. The statute, U.S.C.A., Title 35, Section 33, requires that the applicant for a patent on an invention "shall file in the Patent Office a written description of the same, and of the manner and process of making, constructing, compounding, and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains * * to make, construct, compound, and use the same; and in case of a machine, he shall explain the principle thereof * * * so as to distinguish it from other inventions * * *."

This section of the statute has been considered and construed many times by the Supreme Court. The law is clear and very well established that the claims in the letters patent determine the invention patent-

864

ed, and that one cannot go beyond the claims themselves to establish infringement "since all inventions, devices and improvements diclosed by the specifications and not covered by a claim are dedicated to the public". Walker on Patents, 6th Ed., Sec. 219. General Electric Co. v. Wabash Appliance Corp., 304 U.S. 364, 58 S.Ct. 899, 902, 82 L.Ed. 1402, holds: "The claims [of an application for a patent] 'measure the invention'."

Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 459, 79 L.Ed. 1005, holds: "The claims of a patent define the invention."

See White v. Dunbar, 119 U.S. 47, 51, 7 S.Ct. 72, 30 L.Ed. 303; Howe Machine Co. v. National Needle Co., 134 U.S. 388, 394, 10 S.Ct. 570, 33 L.Ed. 963; Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 510, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas.1918A, 959.

In his application for a patent, Mr. Todd explained the principle of operation by stating that it consisted of the functioning of "electrodes reversely affected by acid or alkali electrolytes" and did "distinguish it from other inventions".

A more extended explanation is shown at the beginning of the patent as follows:

"This invention relates to liquid testing apparatus and more particularly to an apparatus for testing liquids for acidity or alkalinity. An important object of the invention is to provide a device of this character which gives a continuous indication of not only the acid or alkali content of a moving liquid, but likewise gives the proportion of such acid or alkali content.

"A further object of the invention is to provide an instrument of this character comprising the combination of a galvanometer and a pair of electrodes of such character that the direction of current produced is reversed if these electrodes are withdrawn from an acid solution and placed in an alkali solution."

The first patent sets forth eight different claims, each and all of which contain the following language: "Testing apparatus of the type described comprising a primary cell having electrodes reversely affected by acid or alkali electrolytes, and a galvanometer across the terminals of the cell graduated in terms of acidity and alkalinity."

To claim No. 2, in addition to the foregoing, is added the following words: "and

means associated with the cell for preventing variation of the current output thereof due to changes in temperature of the electrolyte."

Claim No. 3, in addition to the claim as made in No. 1, contains the following words: "and an automatically varied resistance across the terminal of the cell having its resistance varied in proportion to the temperature of the electrolyte within the cell."

Claim No. 4, in addition to the language in claim No. 1, adds the following: "and adjustable means for determining the output of the cell delivered to the galvanometer."

Claim No. 5, in addition to the language in claim No. 1, contains the following words: "one of said electrodes comprised of iron, the other of the electrodes comprising an alloy of antimony and cadmium."

Claim No. 6, in addition to the language contained in claim No. 1, adds the following: "one of said electrodes comprised of iron, the other of the electrodes comprising an alloy of antimony and cadmium, the proportion of antimony to cadmium in the second named electrode being approximately ninety-five per centum antimony to five per centum cadmium."

Claim No. 7, contains in addition to the language in claim No. 1, the following: "means associated with the cell for preventing variation of the current output thereof due to changes in temperature of the electrolyte and means for neutralizing heat induced currents across the electrodes."

Claim No. 8, in addition to the language contained in claim No. 1, adds the following: "and means for neutralizing heat induced currents across the electrodes."

The second patent differs principally in that instead of alloyed electrodes of antimony and cadmium, it is formed of two separate elements, one of antimony and one of cadmium. One of these electrodes being directly connected with the terminal of the galvanometer and the other being connected therewith through resistance. The plaintiff, in his brief, summarizes the claims of the patent in the following language: "The apparatus as disclosed by the patent, consisted of a primary cell having electrodes reversely affected by acid or alkali electrolytes and a galvanometer across the terminals of the cell graduated in terms

of acidity and alkalinity and means associated with the cell for preventing variation of the current output thereof due to changes in temperature of the electrolytes. One of the electrodes being comprised of iron and the other of the electrodes being comprised of an alloy of antimony and cadmium. The proportion of antimony to cadmium in the second named electrode being approximately ninety-five per centum antimony to five per centum cadmium. The apparatus also contained means for neutralizing the heat induced currents across the electrodes."

■ The general, if not universal, rule for tests of infringement is that: "To sustain the charge of infringement, the infringing device must be substantially identical with the one alleged to be infringed in: (1) the result attained; (2) the means of attaining that result; (3) the manner in which its different parts operate and co-operate to produce that result. If the devices are substantially different in either of these respects, the charge of infringement is not sustained." Electric Protection Co. v. American Bank Protection Co., 8 Cir., 184 F. 916; and also the following cases: McDonough v. Johnson-Wentworth Co., 8 Cir., 30 F.2d 375; Union Paper-Bag Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935; Diamond Power Specialty Co. v. Bayer Co., 8 Cir., 13 F.2d 337.

In the accused machine, the result attained is the same as the result attained by the Todd machine. The means of attaining the result, however, and the manner in which its different parts operate and co-operate to produce that result, are substantially different, as shown by the evidence. "The means of attaining the result" in the Todd device, as disclosed by the specifications and every claim in the patents, involve a combination of "electrodes reversely affected by acid and alkali electrolytes". The "reversal of polarity" is the means by which the invention indicates whether the solution under measurement is acid or alkali. The indication is registered by a galvanometer across the terminals graduated in terms of acidity and alkalinity. In operation, the electrodes are placed in a moving solution. If the solution is neutral, as to acid or alkali, an indicator reads "zero". If acid predominates, the energy, if I may use that term, generated by the electrodes passing through the galvanometer moves the indicator to the left and registers the degree of acid, while if the moving solution contains an excess of alkali, the change of polarity causes the energy to flow in the opposite direction, or to the right, and in so doing will change the indicator in the galvanometer to the right, indicating the degree of alkalinity.

"Reversal of polarity" is the essence of the invention. It is recited in every claim of the patents. It is the means by which the measurement of the acid and alkali in the solution is made. Mr. Todd, in a deposition received in evidence, testified that without reversal of polarity his system would not operate; that he could not determine without this reversal of polarity whether the measurement was of an acid or alkaline solution.

The means of attaining the result with the accused machine involves no reversal of polarity, and to the opposite of the Todd machine, it would not operate if there was a reversal of polarity. It requires an outside electric force, measured and known, inducted into the machine for the purpose of balancing the force produced in the electrolyte. In the accused machine is a combination of electrodes in an electrolyte, which produces a tendency of current to flow in the same direction, whether the solution be acid or alkaline, and the measurement on the indicator, which is somewhat similar to the galvanometer used in the Todd machine, measures and indicates how much external force is required to overcome the flow. In the Todd machine, the measurement and indication depends upon the degree of the flow. The accused machine determines the pH values which, according to the evidence, does not depend upon the degree of such flow, but depends largely upon the current brought into the accused machine from an external battery. This outside force or flow of energy is measured in order to determine how much force is required to overcome it, and that is what is measured for the determination of the pH values.

Some claim is made on behalf of the plaintiff that the antimony electrode contained in his machine was an improvement upon other combinations of separate elements. Plaintiff's counsel states at the beginning of the trial: "Our patent must stand or fall upon the use and discovery of the antimony electrode in connection with the thermocouple (temperature responsive current-control means) which

overcomes any change in temperature of the solution being tested."

And the further statement: "The plaintiff only claims infringement of that part of his machine which includes the antimony electrode assembly and the temperature control device."

Nowhere in the claims set forth in the patent do we find any claim made or allowed covering an antimony electrode. The patent covers merely a combination or union of elements of iron, cadmium and antimony, jointly producing a "reversal of polarity", which when in operation and used in connection with the galvanometer indicates acidity and alkalinity in a moving beet sugar solution.

As heretofore pointed out, this is entirely distinct and different from the means of attaining the result with the accused machine. Consequently, we conclude that there is no infringement, and that the action should be dismissed.

As to the second defense, we find it unnecessary to determine or pass upon the validity of the plaintiff's patents, and we explicitly refrain from doing so.

The action will therefore be dismissed at the costs of the plaintiff. Counsel for the defendant will prepare appropriate findings of fact and conclusions of law in keeping with this memorandum, and are requested to submit a copy thereof to counsel for the plaintiff before presenting same to the court, in order that counsel for plaintiff may have an opportunity to object thereto in any particular before such findings and conclusions are duly entered. For that purpose, counsel for the plaintiff will be allowed ten days from date of service of such copy to present any such objections.