## I. D. RUSSELL CO. et al. v. DR. SALSBURY'S LABORATORIES.

### No. 14535.

United States Court of Appeals
Eighth Circuit.

Aug. 5, 1952.

Rehearing Denied Aug. 28, 1952.

Johnsen, Circuit Judge, dissented.

Charles J. Merriam, Chicago, Ill. (John Rex Allen, Chicago, Ill., Richard K. Phelps and Horace R. McMorris, Kansas City, on the brief), for appellants.

Thomas E. Scofield, Kansas City, for appellee.

Before GARDNER, Chief Judge, and THOMAS and JOHNSEN, Circuit Judges.

THOMAS, Circuit Judge.

This suit was brought by the appellee, Dr. Salsbury's Laboratories, an Iowa corporation, against the I. D. Russell Co., a partnership, of Kansas City, Missouri, for infringement of patent No. 2,450,866, issued October 5, 1948, to Neal F. Morehouse and Orley J. Mayfield and by them assigned to the plaintiff. The plaintiff demanded an injunction, an accounting for profits, damages, costs and attorney fees. The defendants pleaded misuse and invalidity of the patent and filed a counterclaim for damages.

The case was tried to the court without a jury. The court made findings of fact and conclusions of law and entered judgment for the plaintiff and against the defendants, dismissing the counterclaim. The court held that the patent is valid, that it was not misused by the plaintiff, granted an injunction as prayed, awarded damages in the amount of $12,000, for an attorney's fee in the amount of $3,460, for costs, and for an accounting for profits. The defendants appeal.

The patent involved is for a "Poultry Treatment Composition." The court found

that claims 1 to 4 and 12 to 16 were infringed. Claims 1 to 4 are for a medicinal preparation for the treatment of chickens to stimulate growth. Claims 12 to 16 cover a medicinal preparation to control coccidiosis in chickens.

Claim 4, which is typical of the first group, reads: "A composition for the treatment of poultry comprising an aqueous solution containing 3-nitro-4-hydroxy phenyl arsenic acid in the approximate concentration range of 0.00005% to 0.035%.

Claim 16 is typical of the second group. It reads: "A composition for the control of coccidiosis in poultry comprising an aqueous solution containing 3-nitro-4-hydroxy phenyl arsenic acid in the approximate range of 0.0079% to 0.035%.

In their briefs the parties refer to the chemical used as 3-nitro. Eliminating technical terms, claim 4 means a solution of 3-nitro in water within the concentration range stated, and claim 16 means a solution of 3-nitro in water within the range stated in the claim. The patent is for a composition of two unpatented substances, water and 3-nitro.

Neither of the parties manufacture and sell the patented composition; " * * * that is to say, they do not practice the invention." Mercoid Corporation v. Minneapolis-Honeywell Regulator Co., 320 U.S. 680, 683, 64 S.Ct. 278, 280, 88 L.Ed. 396. John G. Salsbury, vice-president and general manager of the plaintiff, testified: "Our company sells a product called Renosal * * * a Renosal powder and a Renosal tablet * * * and another product called Nitrosal. We haven't granted any license under the patent in suit * * * I believe there is an implied license with each package of Renosal that we sell to use or make a product containing water and 3-nitro * * *." Printed on each package is the number of the patent with directions for mixing the Renosal or 3-nitro with water or food.

Dr. Neal F. Morehouse, one of the patentees and an employee of the plaintiff, testified: "When we found this 3-nitro was effective we did not mix it up with water in the proper dosage and sell it in that form because it would have been uneconomical. Our smallest package of Renosal * * * is a 25 tablet package, weighing approximately one ounce. If you marketed that in a diluted form, ready for the consumption of poultry, it would require approximately the shipping of 103 pounds of material, compared to one ounce of material, and that would be mostly water."

The defendants manufacture and sell 3-nitro under the trade names of Korum and Zuco with instructions how to mix them with water for consumption by chickens. The court found that the differences between defendants' Korum and Zuco and plaintiff's Renosal are inconsequential and that they infringe the patent.

In their brief the defendants say that while they believe the patent involved is clearly invalid, they are not primarily concerned with that issue. Their principal contention, and upon which they primarily rely, is that plaintiff misuses its patent in that by its method of doing business and by this suit it is endeavoring to maintain a monopoly on the sale of the unpatented 3-nitro. This alleged misuse of the patent is shown by the fact set out above, namely, that the plaintiff does not grant a license to any one to use the patent except the implied license granted to the purchasers of its Renosal products.

Plaintiff's contention on this point is that it does not sell the unpatented 3-nitro in bulk with any restrictive conditions. Counsel for the plaintiff says: "All that plaintiff does is produce a preparation especially adapted for formulating a drinking water medication for poultry, and in so doing, he identifies his product unequivocally and restrictively through the label directions placed upon the containers. Presented in this specific form, plaintiff's composition no longer has the character of common raw material or commodity of commerce, but qualifies as a distinct commercial entity within the limits of the patent grant. And, indeed, this is the only feasible method of exploiting the patent, * * * since it is prohibitively uneconomical to ship tons of water all over the nation in order to dispose of a few grains of 3-nitro. It is therefore unsound to contend that plaintiff

sells an unpatented article with an implied license to use."

The law, we think, is clear on this contention. If the defendants' contention is sound we need not determine whether the composition is patentable. Carbice Corporation of America v. American Patents Development Corporation, 283 U.S. 27, 51 S.Ct. 334, 335, 75 L.Ed. 819. In the cited case the Court says also that if a patent is valid the patentee may charge a royalty or license fee for its use—"But it [the patentee] may not exact as the condition of a license that unpatented materials used in connection with the invention shall be purchased only from the licensor; and if it does so, relief against one who supplies such unpatented materials will be denied. The limited monopoly to make, use, and vend an article may not be 'expanded by limitations as to materials and supplies necessary to the operation of it.'" Citing Motion Pictures Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 515, 37 S.Ct. 416, 61 L.Ed. 871. The Court said further in the same opinion: "If a monopoly could be so expanded, * * * The owner of a patent for a process might secure a partial monopoly on the unpatented material employed in it. * * * *"

The Supreme Court thereafter referring to the Carbice case, supra, said in Leitch Manufacturing Co. v. Barber Co., 302 U.S. 458, 463, 58 S.Ct. 288, 290, 82 L.Ed. 371; "By the rule there declared every use of a patent as a means of obtaining a limited monopoly of unpatented material is prohibited."

The argument of the plaintiff that it would be inconvenient and uneconomical to sell and ship the patented composition is without merit. In Mercoid Corporation v. Mid-Continent Inv. Co., 320 U.S. 661, 666, 64 S.Ct. 268, 271, 88 L.Ed. 376, a patent case in which this same situation was urged, the Court said: The necessities or convenience of the patentee do not justify any use of the monopoly of the patent to create another monopoly."

So, also, is plaintiff's contention without merit that in selling 3-nitro, an unpatented article, under the trade name of Renosal, and by restricting its use, except under the patent by directions on the label, the 3-nitro thus becomes identified with the patent and is no longer a common raw material but that it becomes an entity within the patent. Even if such magical transformation is true as to Renosal, it does not apply to 3-nitro sold by others. In the Carbice case, supra, Mr. Justice Brandeis, speaking for the Court, said: "Control over the supply of such unpatented material is beyond the scope of the patentee's monopoly; and this limitation, inherent in the patent grant, is not dependent upon the peculiar function or character of the unpatented material or on the way in which it is used." And in the Mercoid case, supra, the Court, after quoting the foregoing excerpt from the Carbice case, said: "We now add that it makes no difference that the unpatented device is part of the patented whole." And the Court further stated: "Since none of the separate elements of the combination is claimed as the invention, none of them when dealt with separately is protected by the patent monopoly."

The plaintiff contends further that the decree of the district court is right because by directions on the labels of defendants' products, Zuco and Korum, the purchaser is instructed to mix them with water before using. A similar contention was urged before the Supreme Court in B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 408, 86 L.Ed. 367, and the Court said: "We may assume, for purposes of decision, that respondents' infringement did extend beyond the mere sale of the materials to the manufacturers. But in view of petitioner's use of the patent as the means of establishing a limited monopoly in its unpatented materials, and for the reasons given in our opinion in the Morton Salt Company case [Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363], we hold that the maintenance of this suit to restrain any form of infringement is contrary to public policy * * *." And see, also, International Salt Co., Inc. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, and Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L. Ed. 363; 69 C.J.S., Patents, § 313, p. 904.

For the reasons stated the court erred in entering judgment for the plaintiff and against the defendants for an injunction and an accounting and for damages and costs including an attorney fee.

The defendants contend also that the court erred in dismissing their counterclaim. The counterclaim alleges that the plaintiff has violated the anti-trust laws of the United States by using its patent in suit to bring about sales of its unpatented products to the damage of the defendants; that such sales have been made by plaintiff to prospective and to former customers of defendants, who have been deprived of sales of the unpatented product by means thereof; wherefore defendants pray for an injunction, an accounting and for damages.

28 U.S.C.A. § 1338(b) reads: "The district courts shall have original jurisdiction of any civil action asserting a claim of unfair competition when joined with a substantial and related claim under the copyright, patent or trade mark laws. * * *"

The only evidence offered in support of the counterclaim is that of the defendant I. D. Russell. He testified:

"I have prepared a summary of the sales of my products for the year prior to and the year after the suit was started. In the first 9 months previous to the time that they filed this suit against me, I showed an increase in business over the corresponding 9 months previous. In other words, from July 1948 to and including April 1949 —compared to July '49 to April of '50 —there was a loss to the latter, after they had filed the suit, compared to the previous 9 months. It was reported to me from various salesmen of mine that the representatives of the Salsbury organization told numbers of dealers that they wouldn't be able to get Korum and Zuco tablets very much longer because the Dr. Salsbury Laboratories was going to force our firm to discontinue using 3-nitro in Korum and Zuco tablets."

The contention here is that under cover of a patent, whether valid or invalid, the plaintiff is unfairly competing with the defendants in the marketing of unpatented 3-nitro. As disclosed above, the evidence to support the allegations of the counterclaim is very brief and indefinite.

■ Considering the whole record we are impressed that the plaintiff's officers and the patentees at all times acted in good faith. They were mistaken only in regard to their legal rights. We are not convinced on this record that an injunction will be necessary to secure to the defendants their legal rights as established by the courts. And the evidence of damages in the past is not convincing enough that an accounting is warranted or that it is sufficient to justify a trial. The damages, if any are recoverable, would be for special damages recoverable only for losses proven to have been sustained by reason of words spoken by plaintiff's agents, not until now determined to be erroneous. These words are not claimed to have been disparaging of the qualities of defendants' goods; they referred only to the debatable rights of the parties.

The order of the court dismissing the counterclaim is affirmed, and the judgment for the plaintiff granting an injunction and for an accounting and for damages and for costs including an attorney fee is

Reversed.

JOHNSEN, Circuit Judge (dissenting).

The patent here is on a solution of "3-nitro" and water, in fixed proportions, for use as a specific in treating certain poultry disease or as a tonic in stimulating general poultry growth. The water merely serves as a vehicle for inducing natural oral ingestion of the "3-nitro" and for controlling the amount of its dosage.

The situation is a comparatively simple one, but evaluating it in the light of the background, history, processes and results, which the record shows to be involved in the discovery, I agree with the District Court that the discoverer was entitled to a patent, with its accompanying monopoly of the right to use "3-nitro" and water as a poultry-remedy combination.

It further seems obvious to me that, if the poultry industry is to be able to get the

benefit of the discovery, the only way in which this can be made to occur is through the method of sale which the patentee has used. Poultry raisers throughout the country are not, of course, going to buy drinking water for their chickens from the State of Iowa, nor could they afford to do so. The natural consequence of being required to obtain the benefit of the patent in that manner would be simply to leave the chicken world without the remedy.

It is, however, not this consideration which makes me unable to discern in the present situation the existence of the evil which the Carbice case, the Morton Salt case, the Leitch case, the Mercoid case, and the other cases cited in the majority opinion seek to prevent. As a question of market reality, under the test of what the patentee is attempting to do or what may be its commercial effect, I am unable to see here any engaging by the patentee in some tangential exploitation or any producing by it of some collateral monopoly. To me, all that the patentee is doing is vending its poultry medicine.

The patentee is not trying to sell the poultry raiser "3-nitro" but chicken medicine. And the poultry raiser who purchases the patentee's tablets or powder is not on the market for "3-nitro" but for chicken medicine. His is not a demand for a general market commodity but for a product of medicinal form, quantity and direction. Bags or barrels of "3-nitro", standing on a feed-store floor as a market commodity, would not be touched so far as he is concerned. Nor is it the opportunity to sell him "3-nitro" as such a market commodity for which appellants are clamoring. Their business, like that of the patentee, is "the poultry medicine business." What they are after here is the chance to sell medicinal form, quantity and direction, or in other words poultry remedy.

In these commercial realities, it seems to me a strained concept to say that what the patentee is attempting to do is to achieve a monopolistic control of the sale of "3-nitro" as a general market commodity in the chicken-raiser's world, and that in order to do so it is making its patent available to any chicken-raiser by way of implied license for using such "3-nitro" as may be purchased from it, in water solution, as a poultry remedy. In common sense viewpoint and in market significance, the patentee is simply selling to a chicken-raiser, as a purchaser and not as a licensee, its patent preparation, in dry form, with directions for adding the necessary quantity of water. I should regard the sale of any patented preparation, of which ordinary water is an ingredient, as constituting in sufficient substance a practicing of the patent, where it is sold without the water and directions are given the purchaser for the adding of it. And I can see no difference in this respect whether the other ingredients involved are many in number or few.