## AERO SPARK PLUG CO., Inc., et al. v. B. G. CORPORATION.

District Court, S. D. New York.

June 14, 1941.

Emery, Varney, Whittemore & Dix, of New York City (Lucius E. Varney and Nichol M. Sandoe, both of New York City, of counsel), for plaintiffs.

Harry A. Yerkes, Jr., of New York City (Lee B. Kemon, of Washington, D. C., of counsel), for defendant.

LEIBELL, District Judge.

This is a suit for infringement of United States Patent #1,958,580 which relates to spark plugs. As stated in the opening paragraph of the patent "the object of the invention is to improve the spark at the proper gap through the elimination of parasitic discharges and leakages of the ignition current". The patent was applied for on July 17, 1931 by Armen A. Kasarjian who, simultaneously with the execution of his application for said patent, assigned all his right, title and interest in his invention to the plaintiff, Mosler Ignition Corporation, to which the patent was issued on May 15, 1934. Plaintiff, Aero Spark Plug Co., Inc., is the exclusive licensee under the patent. Defendant is a large manufacturer of aviation spark plugs. The patent as issued contained five claims, only one of which, to wit, claim 2, is involved in this litigation. The defenses interposed are non-infringement and invalidity of the patent in suit.

A conventional form of aviation spark plug assembly has a central metal spindle around which are tightly wrapped thin mica sheets, forming what is generally

called a mica cigarette. About midway on this mica cigarette is placed a tightly fitting brass sealing cone which in the spark plug structure is located about opposite the coupling nut. Around the mica cigarette, both above and below the brass sealing cone, layers of mica washers are fitted, so that the cigarette is contained within the washers. In that way the mica cigarette is surrounded, both above and below the brass sealing cone, by a thick body of insulation made up of two stacks of mica washers. The central metal spindle, with its mica insulation and sealing cone, form the core of the plug. This core is then fitted into a metal shell, so that the metal shell of the plug is electrically separated from the metal spindle by the insulating element, the mica cigarette at the brass sealing cone and by the mica cigarette plus mica washers above and below the sealing cone.

The specifications of the patent in suit recite that the inventor after exhaustive experimentation and research, particularly with aviation spark plugs, became convinced that the most serious difficulty encountered in spark plug operation was the direct result of what he called a parasitic discharge in the inner plug structure due, primarily, to the presence of air pockets within the inner structure. A parasitic discharge appears to be any flow of current through the plug in the form of a disruptive discharge. This has the effect of robbing the current potential at the proper spark-gap.

It was generally known in the art as far back as 1924 at least, that when air was confined within the substantially closed pocket, such as is commonly found in conventional plug assembly, ionization of the air resulted, and such ionization proceeded rapidly until a point was reached at which the dielectric property of the air was so lowered that electric current might pass through it in the form of a jump spark. When this occurred within the plug structure, short circuiting of the proper spark-gap of the plug might result and no flash took place at the spark-gap. If this occurred the engine would skip or miss because the gaseous charge in the cylinder would not be ignited by a flash from the spark plug at the spark-gap.

It was also known in the art in 1927 that some of the spark plug cores constructed as hereinabove indicated would "fire along the core between the core insulator and mica washers when the core is removed and tested with a booster magneto" and that this was due to the fact that there was an air pocket between the outermost convolution of the mica cigarette and the inner circumference of the mica washers. Indeed, it had been suggested in August, 1927, to Mr. Paulson, the chief engineer of the defendant, by Mr. George L. Shumaker, a testing engineer of the United States Army, that "some plastic insulating compound be placed on the spindle insulator."

Kasarjian claims to have discovered that by effectively eliminating all the air pockets within the plug the resistance throughout the plug structure could at no time become less than the resistance at the proper spark-gap, with the result that the so-called parasitic discharge would also be eliminated. He contends that the parasitic discharge within the spark plug presented a problem to the rapidly developing aviation industry, and that the production of a spark plug capable of withstanding, without flashover, the high degree of fuel compression and heat generated by modern aviation engines is what his invention sought to accomplish. The high compression has the effect of building up resistance to the ignition current between the electrodes at the proper spark-gap. The patent in suit asserted that its objective, i. e. the elimination of air pockets within plug structure, could be attained by filling up all the air space between the sheets of mica in the cigarette, between the mica washers themselves and between the inner circumference of the mica washers and the cigarette mica body, with a suitable refractory substance of high dielectric value, such as silicate or ceramic compounds or mixtures, plastic mica, or the like, which will not carbonize. The patent taught that these refractory substances should be applied in a plastic or semi-liquid condition under pressure to fill all the air pockets and crevices inside the plug.

The patent describes the manner in which the filling is to be accomplished during the assembly of the parts of the plug, so that "all air is thereby expelled from the interior of the plug structure". It states that in wrapping the cigarette mica "one end of each piece as it is applied is dipped into the insulating substance" so that "there is sufficient insulating substance thereon to spread itself over both surfaces of the mica of the sleeve 5, so that

each successive turn of the mica becomes embedded in the substance". The specifications claim that as a result, when the cigarette mica has been wrapped around the electrode, "the wrapped body becomes in effect a solid body from which all air has been excluded by the flow of the insulating substance". In assembling the two stacks of mica washers or discs the patent teaches that the discs are coated with the insulating substance in liquid or plastic form as they are put on and "consequently all spaces between consecutive laminations, as well as the space 8 between the inner periphery of these disks and the cigarette mica body 6 is flowed full of the insulating substance".

The patent recites "It will of course be understood that the parts of the plug structure are assembled under pressure, so that all the insulating substance is caused to fill up all spaces in the interior of the plug structure and thereby exclude air therefrom through displacements of such air".

The patent further recites that in this process the narrow annular air space between the mica cigarette and the inner circumference of the mica washers will be filled up with the insulating material, and that the insulating bodies, that is, the mica cigarette and the mica washers are "amalgamated or bound together into one substantially solid block of material of a non-cellular and non-porous structure".

The patent specifications further state:

"The operation is somewhat similar from a mechanical standpoint to the practice which has been heretofore employed of dipping cigarette mica into some lubricant, such as lubricating oil or linseed oil, the purpose heretofore being to facilitate the tightening of the plug against gas leakage.

"My experience, however, with the use of oil, as stated, is that the oil which under such conditions works into the spaces 8 and 10 (the spaces between the mica cigarette and the inner circumference of the mica washers) quickly carbonizes, so that the spaces 8 and 10 are divided graphically speaking into a series of relatively small gaps interposed between bodies of carbon, whereby the resistance to the passage of current is quickly reduced below the resistance of the gap between the electrodes 2 and 3 which describes (sic., evidently the word intended is 'destroys') the usefulness of the plug. The insulating substance of the present invention is necessarily a refractory di-electric substance, which will not carbonize, but I have found nevertheless that when using such a substance I obtain all the advantages inherent in the use of lubricating or linseed oil, so far as their function of facilitating the tightening of the plug is concerned, and at the same time obtain a permanent dielectric with a permanent exclusion of air. This can never be accomplished by the oils which have heretofore been used to facilitate tightening of the plug parts during assembly." [The matter in parentheses is explanatory and inserted by the Court]

The asserted feature of novelty or invention which the patentee claims he would add to the built-up mica insulation is a plastic of semi-liquid refractory (i. e. heat resistant) insulating substance (by coating or "impregnating" the mica elements) in such a manner that the added insulation completely displaces the air from all of the pockets and crevices of the built-up mica insulation. It was long known to the art that the use of ceramic materials for electric insulating purposes would provide an insulator with refractory properties, that is, an insulator that would withstand intense heat.

It appears that the patent proceeds to the assertion of its claims upon the following reasoning: Air spaces within the mica insulation will, when the spark plug is in use, become ionized through what is known as "corona"; when ionized these air spaces present parallel paths through which the electric current may pass in flash-over or parasitic discharges; these flash-overs rob the electric current which should pass to the central electrode at the proper spark gap, which affects the usefulness of the spark plug under high pressure and intense heat. If all the air space within the mica insulation can be removed, there will be no air for the corona to ionize and no path for a parasitic discharge. A refractory dielectric substance, inserted while the mica insulation is being built up, will fill all the air spaces and will withstand the heat of the plug in operation. All residual air will thus be permanently excluded and there will be no flashover and the electric current will reach the proper spark gap without being diminished.

Claim 2 of the patent, on which this suit rests, is as follows: "2. A spark plug embodying a shell provided thereon with a grounded electrode, an insulating element

mounted within said shell, a central electrode extending through said insulating element and in relatively close fitting relation thereto, and means for precluding corona discharges through the plug comprising an insulating refractory substance filling the air pockets within the insulating element to exclude residual air from said element."

The alleged infringement of the defendant is that at several metal points in the spark plug it employs refractory dielectric material as a barrier to prevent the electric current from entering the air spaces within the plug and from reaching a metal part of opposite polarity, and that some of this refractory dielectric material employed by the defendant penetrates the annular air spaces between the mica cigarette and the inner circumference of the mica washers. This penetration is in irregular streaks, in a few instances extending to a quarter or a third of the distance between the two metal parts of opposite polarity, but in the majority of cases extending for only a very small fraction of that distance.

The defendant claims that this slight penetration of the refractory dielectric substance is not for the purpose of filling the air spaces but occurs incidentally to the creation of the barrier between the metal parts and the ends of the mica washer stacks. Defendant claims that after these barriers are constructed air spaces continue to exist within the spark plug but that these are of no concern because a satisfactory barrier has been constructed to retain the electric current within the electrode and to prevent it from flashing over to a metal part of opposite polarity.

It appears from the evidence and I have made findings to that effect, that in the latter part of 1936, defendant first used added refractory material to augment the built-up mica insulation of its spark plugs. Defendant's first use of added refractory material consisted of powdered mica mixed with a binder such as glyptol or sauereisen, which material, in plastic condition, was applied with a brush, exteriorly of the cigarette, at four places, namely, at the top and bottom of the brass sealing cone, and at the opposite ends of the spindle cigarette. In August, 1939, defendant began the use of added refractory material in the form of small rings, called "doughnuts" (Def's Ex. F), consisting of powdered refractory material and an organic binder, which rings are deformed by assembly pressure, exerted longitudinally of the plug. With unshielded spark plugs (as shown by Pl's Ex. 1), defendant applies the rings of refractory material at three places, namely, at the top and bottom of the brass sealing cone and at the upper end of the mica cigarette (Pl's Ex. 8, the smaller figure at the right). In its shielded spark plugs (as shown by Pl's Ex. 2), defendant applies the rings of refractory material at only two places, namely, at the top and bottom of the brass sealing cone (Pl's Ex. 8, the larger figure at the left). In the assembly of its spark plugs, defendant uses no greater pressure, axially of the spindle, to compress the mica insulation and deform the rings of refractory material, than was formerly employed by defendant in the assembly of spark plugs without added refractory material. In the assembly of defendant's spark plugs, the mica sheets forming the "cigarette" around the central electrode (spindle) are wound dry, with no binder or added material of any sort between the convolutions, nor between the innermost convolution of the mica cigarette and the central spindle. In the assembly of defendant's spark plugs, no refractory material is applied to the individual mica washers in either of the two stacks that surround the cigarette mica. In the assembly of defendant's spark plugs, the deforming of the rings of refractory material may cause slight penetration of the refractory material into the annular space between the outer surface of the cigarette mica and the surrounding mica washers, as hereinabove indicated.

Defendant has never manufactured spark plugs in which the added refractory material fills, or substantially fills, the annular air space between the outer surface of the mica cigarette and the surrounding mica washers. Defendant's sole purpose in adding the refractory material is to place an insulating barrier or barriers in certain potential paths of flash-over. Defendant does not add refractory material in all of the potential paths of flash-over and makes no attempt to fill nor does it fill all of the air pockets within the built-up mica insulation of its spark plugs. Further, defendant makes no attempt to exclude, nor does it exclude all the residual air from within the insulating element of its spark plugs.

Claim 2 of the patent in suit uses the expression "means of preventing corona

390

discharges through the plug". I interpret this to mean parasitic discharges or flash-overs, which Kasarjian described as being induced by the ionization of the air within the air spaces of the mica insulation, as described in the specifications. He thought that the way to correct it was to use the ceramic refractory dielectric material to remove all the residual air from within the spark plug, which would in turn prevent the ionization of the air and the so-called corona discharge. The claim must be read in the light of the specifications. Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871, L.R.A.1917E, 1187, Ann.Cas. 1918A, 959. In that way the true meaning and intention of the inventor is ascertained. Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co., 8 Cir., 215 F. 362, 373. Nine times in the course of the specifications the inventor, Kasarjian, refers to the necessity of filling all air spaces or pockets within the plug to exclude all the air.

The defendant in constructing its spark plug applied the idea of placing a barrier of refractory insulating material at certain points where the mica insulation was in contact with metal parts of the plug so as to prevent the flash-over of the current. In defendant's spark plug, the added refractory material is intentionally positioned outside of, rather than within the insulating element. The defendant thus insulates certain portions of otherwise exposed metal parts.

■ I am of the opinion that the two methods of approach to the solution of the one problem, presented by the air pockets and the resultant flash-over within the plug, are essentially different and the defendant's method does not constitute an infringement of the patent in suit.

■ We have here no identity of either means or results. The means are clearly different as hereinabove indicated. Assuming that the ultimate result sought by Kasarjian was the same as that achieved by the defendant, a spark plug constructed by the method described in Kasarjian's specifications would not in use produce the results he claimed for it. That is admitted. For infringement there must be substantial identity of both means and result. Westinghouse v. Boyden Power Brake Co. (Boyden Power-Brake Co. v. Westinghouse), 170 U.S. 537, 568, 18 S.Ct. 707, 42 L.Ed. 1136; Standard Computing Scale Co. v. Computing Scale Co., 6 Cir., 126 F. 639.

The evidence presented at the trial established to my satisfaction that the method of applying the refractory ceramic material as described in the plaintiff's patent was not workable and did not produce any useful result. Kasarjian testified in effect that a spark plug constructed as specified in his patent was not useful in practice, that it did not solve the problem to which he had applied himself, that the plug did not improve by this process at all. Plaintiff's expert, Dr. Peters, was of the opinion that applying the refractory material in the manner described in the Kasarjian patent would produce a defective plug. He did not see how the water of the mixture could be removed without leaving the plug "porous and leaky". Also, there was danger that if you get the sealing material too hard it might crack the mica. A porous spark plug would be just the opposite of what the patent claimed for it.

At no time during the trial did the inventor produce any spark plug which he constructed in accordance with the method described in his patent. Of all the spark plugs produced at the trial and offered in evidence, not one was constructed by the inventor or by either of the plaintiff corporations, all were products of the defendant corporation. I cannot give credence to the testimony of the inventor that he constructed a number of spark plugs, to which he applied liquid porcelain at four places (at the top and bottom of the two stacks of mica washers) and that he submitted those spark plugs for test purposes to the engineers of the United States Army or Navy and that they proved satisfactory. No corroborating witness was called, either from among the employees of the plaintiff corporations or from the staff of the engineers of the United States Army to testify concerning plaintiff's spark plugs. Nor was any corroborating witness called from among the plaintiff's employees to support Kasarjian's testimony that he applied refractory ceramic material in liquid form at four certain points of the spark plug somewhat in the same manner as the defendant. It seems strange that if the Kasarjian plug thus submitted for test purposes met the tests satisfactorily, it was never produced commercially. Kasarjian testified: "This plug was not developed. I only made them for test purposes."

Kasarjian had the advantage of being present when Mr. Paulson, the defendant's engineer, was examined before trial and heard him describe fully the method employed by the defendant in constructing its spark plugs. Kasarjian's patent was never adopted by the public. It has not the support of any practical use at any time. It was inoperative and of no use to the art. The claim of the inventor appears to me to be without merit.

■ I am of the opinion that Claim 2 of the patent in suit (the only claim the plaintiffs urged against the defendant's practice) is invalid for lack of invention over the prior art. Mosler (Patent #1,320,637 issued November 4th, 1919) used built up mica washers as an insulation for a spark plug and proposed by the use of a shellac to "eliminate the air pockets between the laminae", and produce "a unitary body of great density". True the shellac was not refractory, but the idea of "eliminating the air pockets" was clearly advanced. Thomas in his patent #1,521,733 issued January 6, 1925, states, "In carrying out my invention, the mica tube 17 is made by winding a strip of thin mica to produce a tubular form after which the same is coated internally and externally by a cement preferably including a silicate base such for example as potassium silicate or sodium silicate. The tube thus coated is then baked in order to drive the cement in any of the crevices and interstices which may exist in the mica and between the wrappings thereof". The Thomas patent then asserts that "it will be impossible for the mica tube to become saturated with any oils or products of combustion and an ideal insulator is thus provided by the mica tube so that transverse current leakage or short circuiting is practically impossible irrespective of the use to which the device is put".

The Thomas patent was cited (see the Patent Office file wrapper) against five of the group of seven claims in Kasarjian's original application. Two of the seven had previously been withdrawn for another reason. As a result of the citation of the Thomas patent Kasarjian finally withdrew four of the remaining five claims. He amended one of them and supplemented it with four additional claims, of which claim #2 is one. But before doing this Kasarjian filed a memorandum dated December 27, 1932. In it he asked that one of his said five claims be amended so as to show the cigarette mica wrapper about the electrode "in close fitting relation thereto" and that the refractory insulating substance be shown as interposed also "between the laminated sleeve and said electrode". It is probable that this amendment was offered to form the basis for the applicant's argument that Thomas' patent "shows a pocket extending for the full length of the insulating element and this pocket is not filled at all except by air which would form an ideal situation for parasitic discharges". Kasarjian urged that his own claims "refer to the insulating element as having therein pockets which are filled with the insulating refractory substance to exclude the lodging of residual air in pockets", and he added: "Applicant has produced what tests have proven to be a substantially corona proof plug, while the references of record show nothing of the sort". Kasarjian argued that the Thomas patent did not disclose a corona-proof plug, while his own did. The same distinction applies to the plug described in Kasarjian's patent and the alleged infringing plugs of the defendant, which are not corona proof.

In again rejecting the original claims 1 to 4 of the Kasarjian application the examiner stated that they were "rejected on Thomas, of record". He added: "Limitations mentioned in applicant's argument by which an improved result is alleged are not included in these claims. Thomas discloses a mica tube impregnated with a silicate and fully covers the invention as broadly stated in the claims 1 to 4". It should be noted that in each of the original claims 1 to 4 the applicant Kasarjian, had included "an insulating refractory substance filling said pockets to exclude the lodging of residual air in said pockets".

In finally allowing claims 5 and 8 to 11 (claim 5 was one of the original seven, claims 8 to 11 were added) the examiner ruled: "Since the claims are not drawn to particular structure but to the use of a particular substance, not readily observable on the drawing, applicant is required to add a legend to the proper element of the drawing designating for example, 'plastic mica', 'silicate or ceramic compound mixture', etc." It is thus apparent how narrow and limited a construction the examiner gave to the claims which he finally allowed. The application was filed by Kasarjian July 17, 1931. His patent in the amended and limited form was not issued until May

15, 1934. Even as issued it was, in my opinion, invalid for lack of invention.

The idea of using powdered mica to fill the space between the mica washers and the mica encasing the electrode was not new. The British patent #103,179 issued to Crosbee in 1917 describes an electrode surrounded by a stack of small mica washers (corresponding to the mica cigarette) and then a set of large mica washers outside of the first. A space left between the outer circumference of the small stack of washers and the inner circumference of the larger set of washers was filled with compressed pulverized mica. The first Crosbee patent (#4808 issued in 1915) suggested that scrap mica be used together with a set of mica washers and stated: "A suitable adhesive may be incorporated in connection with the scrap material, if desired". This scrap mica is also referred to as "pulverized" in the first Crosbee patent claims. Defendant between 1936 and 1939 used powdered mica combined with either glyptol or sauereisen at certain points in the plug structure. In 1939 defendant started using a plastic refractory substance in the form of a "doughnut", consisting of a powdered refractory material and an organic binder, the doughnuts being inserted at two or three places where the mica insulating element was in contact with a metal surface.

Plaintiff cites Weiss et al. v. R. Hoe & Co., Inc., 2 Cir., 109 F.2d 722, 723. In that case it was held that the defendant Hoe & Co. had taken the substance of Weiss' invention and accomplished the same results by substantially the same means. The specifications called for an "air tight housing" at the ink fountain of a printing press, to prevent the evaporation of a highly volatile ink, the use of which increased the hourly capacity of the press. I quote from the opinion of the Appellate Court: "The novelty of this combination is said to reside in so arranging the old elements as to make the housing 'air tight' and thus permit the use of highly volatile inks without the deleterious effects incident to ink evaporation". Weiss' machine was known as the "closed fountain" type. The machines in use before that, although they had some closure to prevent splashing, were known as the "open fountain" type. The defendant Hoe & Co. took and applied the patentee's idea of an air tight housing, but argued that in the Hoe housing around the ink fountain there were small spaces through which air could pass, so that in fact the Hoe housing was not air tight. The court held that the defendant's press was in fact made substantially air tight and that the Weiss patent in calling for an "air tight housing" did not demand a closure absolutely air tight, that it meant "a closure as efficient as practically consistent with a proper functioning of the machine as a printing press" and that the defendant's press was "sufficiently air tight to prevent excessive evaporation and permit the high speeds which open fountain presses cannot attain".

■■ An important difference between the Weiss case and the case at bar is that the Weiss patent described a workable apparatus and Kasarjian's patent admittedly does not. If the housing built according to the Weiss invention had not prevented ink evaporation and had in operation developed other openings so that the ink fountain became in fact more accessible to air then there would be some similarity in the two cases, in so far as the respective plaintiffs are concerned. Another important difference in the two cases, in respect to the defendant's products, is that the defendant Hoe took the substance of Weiss' invention and accomplished the same results by substantially the same means, while the defendant, B. G. Corporation, in the present case has not taken the substance of plaintiff's invention nor does it use substantially the same means as that described in the Kasarjian patent. Kasarjian sought to prevent flash-over by filling up the air spaces between the metal parts of opposite polarity, within the spark plug. The B. G. Corporation seeks to and actually does prevent flash-overs by placing an insulating barrier at certain metal parts to prevent any electric current from entering or leaving the air spaces adjacent thereto. Since Kasarjian's invention was addressed to a narrow problem, it is limited to the means disclosed and claimed. He asserted that he devised a particular means of effecting the result of preventing a flash-over through the air spaces in the spark plug. "Assuming his patent to be valid, it is limited to the means disclosed and claimed. It cannot give him a monopoly of all possible means of accomplishing the same result." Weiss v. R. Hoe & Co., supra.

I have signed and filed findings of fact and conclusions of law. The complaint is dismissed on the merits.