The **DUPLAN CORPORATION**, Plaintiff,

v.

**DEERING MILLIKEN, INC., et al.,**
**Defendants.**

**DEERING MILLIKEN RESEARCH**
**CORPORATION**, Plaintiff,

v.

The **DUPLAN CORPORATION** and
**Burlington Industries, Inc.,**
**Defendants.**

The **DUPLAN CORPORATION** et al.,
**Plaintiffs on the Counterclaim,**

v.

**DEERING MILLIKEN RESEARCH COR-**
**PORATION, Defendant on the Counter-**
**claim,**

**and**

**Deering Milliken, Inc., et al., Additional**
**Defendants on the Counterclaim.**

**Civ. A. No. 71–306.***

United States District Court,
D. South Carolina,
Spartanburg Division.

Jan. 2, 1973.

---

* Also Consolidated Civ. A. Nos. 70–968; 69–1096; 68–705; 69–777; 70–14; 70–189; 70–250; 70–295; 70–358; 70–385; 70–386; 70–391; 70–493; 70–622; 70–628; 70–677; 70–683; 71–87; 71–88; 71–89; 71–90; 71–91; 71–92; 71–93; 71–94; 71–95; 71–96; 71–97; 71–98; 71–99; 71–100; 71–101; 71–102; 71–115; 71–126; 71–127; and 71–283.

See also, D.C., 334 F.Supp. 703.

John W. Malley, William K. West, Jr., and W. Warren Taltavull, of Cushman, Darby & Cushman, Washington, D. C., and O. G. Calhoun, Jr., of Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., for Burlington Industries, Inc., Madison Throwing Co., Inc., Leon-Ferenbach, Inc. and National Spinning Co., Inc.

Paul Bell, and Charles B. Park, III, of Parrott, Bell, Seltzer, Park & Gibson, Charlotte, N. C., and Fletcher C. Mann, of Leatherwood, Walker, Todd & Mann, Greenville, S. C., for The Duplan Corp., The Schwarzenbach-Huber Co., Jonathan Logan, Inc., Frank Ix & Sons Va., Corp., Lawrence Texturing Corp. and Burkyarns, Inc. Also Allan Trumbull, of Willkie, Farr & Gallagher, New York City, appeared.

David Rabin, and McNeill Smith, and Michael R. Abel, of Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., for Texfi Industries, Inc., Blanchard Yarn Co., Reliable Silk Dyeing Co., Dixie Yarns, Inc., Tex-Elastic Corp., Hemmerich Industries, Spring-Tex, Inc., Olym-

pia Mills, Textured Fibres, Virginia Mills, Inc., and Throwing Corp. of America.

Thomas A. Evins, of Butler, Means, Evins, & Browne, Spartanburg, S. C., and Jay Greenfield, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Deering Milliken, Inc., and Deering Milliken Research Corp.

Rufus M. Ward, of Ward, Howell & Barnes, Spartanburg, S. C., and Granville M. Brumbaugh, of Brumbaugh, Graves, Donohue & Raymond, New York City, for Ateliers Roannais de Constructions Textiles.

HEMPHILL, District Judge:

On February 4, 1972, plaintiff Throwsters, pursuant to the provisions of Rule 56 of the Federal Rules of Civil Procedure, filed in this court a motion for summary judgment of invalidity as to two separate United States patents. The first motion seeks an order of this court declaring invalid and void United States Patent 3,382,656, filed January 3, 1966, and issued May 14, 1968, in the name of Henri Crouzet, (and assigned to Chavanoz) for "False Twist Frames and Method for Texturing Synthetic Filaments," including all claims of the said patent, on the theory that the American patent is invalid under the provisions of 35 U.S.C. § 102(d)[1] because the alleged invention of the American patent was first patented by the applicant in France (December 27, 1965) prior to the date of the application in this country (January 3, 1966), an application having been filed in France (November 13, 1964) more than twelve months before the filing in the United States. The French patent in question before the court is plaintiffs' Exhibit No. 638, the same being French Patent 1,427,001.

An identical motion was made to have this court declare invalid U. S. Patent 3,137,119, filed June 14, 1961, issued June 16, 1964, in the name of Henri Crouzet, including all claims of said patent(s) pursuant to 35 U.S.C. § 102(d). As to this patent, plaintiffs claim that on June 12, 1961, prior to the date of the application in this country on June 14, 1961, a patent was issued to Ateliers Roannis de Construction Textiles (a French corporation hereinafter referred to as ARCT) on an application filed in France June 8, 1960, more than twelve months before the filing in the United States. (See Exhibit No. 788 which has a copy, in French, of French Patent 1,267,239.)

In addition to seeking a declaration of invalidity, plaintiffs seek to enjoin the defendants from ever again asserting or charging an infringement or seeking to collect royalties on the patents, and ask for attorneys' fees, a return of all royalties previously collected, damages, and other relief.

■ It is admitted that the defendants, or some of them, have sued the plaintiffs for infringement, and as noted in Monsanto Co. v. Rohm and Haas Co. (E.D.Pa.1970), 312 F.Supp. 778, 792, under the decisions of the United States Supreme Court, one who is sued for patent infringement may challenge the validity of the patent on the ground that it was fraudulently procured, or because the patentee was guilty of some other inequitable conduct or bad faith in his proceeding before the patent office. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Hazel-Atlas Glass Co. v. Hart-

[1]. 35 U.S.C.A. § 102(d) provides: Conditions for patentability; novelty and loss of right to patent.

A person shall be entitled to a patent unless—

(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States.

ford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933). Thus, it is obvious that the plaintiff has the right to pursue the motion which is here for a decision.

For the purpose of this record, we can consider the two American patents as having the same posture and the two French patents as having the same posture, that is, in each instance, the application in the United States was filed after the delivery date of the French patent, but before the French patent was published in the *Bulletin Officiel de la Propriete Industrielle* (BOPI). It is admitted that in each instance the delivery date of the French patent was prior to the United States application, and the date of publication in the BOPI was after the application was made in the United States. As to each of the American patents, application was made in the name of Henri Crouzet, as inventor. As to each of the French patents, application was made in the name of Ateliers Roannis de Constructions Textiles S. A. over the signature of Leo Soep. Henri Crouzet has been identified throughout the record in this case as an officer and/or president of ARCT, and Leo Soep has been identified as a conseil in patents frequently employed by ARCT to procure the French patents. All of this is a part of the record upon which this court must make its decision.

Initially, this court has to determine whether or not the French patents and the United States patents are, for all intent and purposes, identical. The arguments as to identity, displayed before the court, were only as to United States Patent 3,382,656, and French Patent 1,427,001.[2] The court has before it, and had at the time of the hearing of the motion, a copy of the French Patent 1,427,001, with an English translation, and a copy of U. S. Patent 3,382,656. An examination of the language of French Patent 1,427,001, as issued by the Institute Nationale de la Propriete Industrielle (INPI) (French Patent Office) and the patent issued by the U. S. Patent Office 3,382,656, leaves no question but that the patent applied for, in each instance, was for the same and identical improvements in False Twist Frames to Texture Synthetic Yarns. It is true that the language in the American patent contains some additions[3] but this does not change the basic nature of the invention (improvement) sought to be patented. The drawing attached to the French patent is a very simple drawing[4] and the drawing attached to the American patent has two figures, Figure One and Figure Two. A comparison of Figure One on the American patent, and the drawing attached to the French patent leaves no doubt but that to identify one is to identify the other, and that the figures on the respective patents represent the same idea or improvement sought to be patented. In addition, counsel for the plaintiffs read into the record of the hearing of the motion a letter from Mr. Soep (of ARCT) to Dr. Norman Armitage (of Deering Milliken Research Corp., hereinafter called DMRC) apparently written and dated in Paris November 8, 1964, containing this language:

> Please find herewith a translation made in Great Britain of a patent application filed in France by our company on the 14th of November, 1964.
>
> We beg you to examine whether a corresponding application should be filed in the United States.
>
> If you choose to file we want you to postpone the filing until the end of the priority period. Of course, you

2. It is agreed that the ruling of the court as to these patents will apply equally to U. S. Patent 3,137,119 and French Patent 1,267,239.

3. It is apparent that the American Patent Office requires more in the way of proof and explanation in the application, explanation and claims, than does the French Patent Office.

4. It appears that a drawing, schematic or otherwise, is not a requirement of French patent law.

may adopt [sic] the wording in any suitable way; the translation does not seem to be very good.

In an obvious reply to this letter, of date December 12, 1964, Dr. Armitage wrote to Mr. Soep:

Thank you for sending me with your letter of December 8th a translation of the patent application filed in France by Chavanoz relating to loom improvements. I am passing it along to Walter Mueller for examination of the subject matter and to decide whether it will be advantageous to file a corresponding application in the United States prior to November 13, 1965.

It may be that another application was contemplated. If so, this was not pressed or explained by the defendants, in any way, and Soep and Armitage are no longer available for clarification (both Soep and Armitage are deceased). Absent any indication that another invention was contemplated, the court, reconciling the dates in the letters with the dates on the patents before it in connection with this motion, is led to conclude that the inventions under study are those involved.[5]

It is significant that the added language in the American patent does not change the device or process sought to be patented. The comparative language of the patents is reproduced as Appendix "A" of this Order for the purpose of comparison.

Introduced into the record of the case, and relied upon by plaintiffs' counsel, is the File Wrapper[6] for original Patent 3,382,656. This shows that Henri Crouzet, of Lorie, France assigned the patent rights or rights of application to Moulinage Et Retorderie De Chavanoz, Chavanoz (ISERE) France, a corporation of France. The principal attorneys shown are Dr. Norman C. Armitage and Walter E. Mueller, with correspondence to be sent to Walter E. Mueller, Post Office Box 1927, Spartanburg, South Carolina.

The testimony reveals that both Armitage and Mueller were, at this time, acting for and in the employ of DMRC. On page 9 of the File Wrapper is a statement dated December 17, 1965, over the signature of Henri Crouzet, and which reports a blank at the end, as follows:

I do not know and do not believe this invention was ever known or used before my invention or discovery thereof, or patented or described in any printed publication in any country before my invention or discovery thereof, or more than one year prior to this application, or in public use or on sale in the United States for more than one year prior to this application; that this invention or discovery has not been patented in any country foreign to the United States on an application filed by me or my legal representatives or assigns more than twelve months before this application; and that no application for patent on this invention or discovery has been filed by me or my representatives or assigns in any country foreign to the United States except as follows:

[Blank]

The space indicated after the word "follows" was blank so that the file reflects M. Crouzet's representation that he did not know of the patent about which Soep had written to Armitage. This has an overtone which may bring into play the equity powers of this court, but the issue of law requires immediate attention. The morality of this representation, or misrepresentation, of course, may be discussed later by counsel, if they desire.

Before entering any discussion as to the delivery date or the publication date of the French patent in France, the court takes judicial notice of the fact that the processing of a patent in the United States and the processing of a patent in France greatly differ. In France, the patent office is concerned primarily with

---

5. The letters have been handed to the Clerk and she has been ordered to make them a part of the official record, since they were read without objection; they are now exhibits in the file of the case.

6. Exhibit No. 951.

(1) novelty and (2) industrial impact. Once a given application has satisfied the filing requirements and been processed, it is ready for delivery (delivré), and some four weeks after delivery it is published in the BOPI. An. example of that may be found in the French patent under consideration which shows, "demandé de le 13 novembre 1964 á 14ʰ 39ᵐ, à Paris; Delivré Pararrété du 27 decembre 1965." (Bulletin Officiel de la Propriete Industriele, no 6 de 1966). The deliverance date is the date of the signing or facsimile of signing by the patent ministry, or minister, and upon that date, and thereafter, the inventor who receives the patent, at his discretion, may disclose the contents of his application to third parties, for selling or other considerations. The applicant has the right to request a postponement for one year in "deliverance." The publication, and making available to the public, is the publication of the "ABREGE descriptive" (summary specification in the official gazette). The moment of publication is considered to be the point of time when the official gazette (BOPI) is brought from the French National Printing Office and physically enters the reading room on the ground floor of the INPI.[7] (Mm. Carpentier cited an example in which, through an accident, the delivery truck coming from the southern part of

Paris was unable to make delivery by INPI office closing hours, making it therefore necessary to issue an "Erraturn" notice to correct the publication date).

The thrust of plaintiffs' argument is that, in each instance, upon the delivery date, each French patent was issued, and the invention was patented or caused to be patented by the applicant on that date. There is no question but that the French application, in each instance, preceded the application for a patent in this country by more than twelve months, which is one of the two requisites affecting validity under 35 U.S.C.A. § 102(d). The contention of the defendants is that the date of publication in the official bulletin, in each instance, is the date the invention was patented, as that completed the French processing of the patent. Defendants contend that until the processing was complete, the invention was not available to the public so as to comprise a date upon which the motion could hang.

 Initially, this court must consider what a patent is and what it does. A patent confers upon the owner the right to exclude others from making, using or selling the invention during the life of the patent.[8] Bell Intercontinental Corporation v. United States (1967), 381 F. 2d 1004, 1010, 180 Ct.Cl. 1071. A patent

---

7. While in Paris sitting as an American court for the purpose of taking live depositions of French witnesses unable to travel to the United States, this court, accompanied by counsel for plaintiffs and for defendants, and an interpreter, visited the French Patent Office. While there, by means of an interpreter, a colloquy was had with a French lawyer, of the Patent Office, who was also Director of Public Relations, Madame Carpentier. Because of objections by counsel, Ms. Carpentier was not allowed to give the French definitions of the term "deliverance", "Arrete", or "Abrege descriptif." The court observed then, and later, that he would prefer to have the French Court say when a patent came into being, or when a process became a patented process, rather than have an American Court interpret the impact of the French processing apparati. This was objected to

by counsel, and so this court is put in the position of having to interpret, by application of American law, the impact of the activities in France on the French patent in question. This court must interpret the effect of "delivré" and "publication."

8. 35 U.S.C.A. § 154 provides: Contents and term of patent.
 Every patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, for the term of seventeen years, subject to the payment of issue fees as provided for in this title, of the right to exclude others from making, using, or selling the invention throughout the United States, referring to the specification for the particulars thereof. A copy of the specification and drawings shall be annexed to the patent and be a part thereof.

by its very nature is affected with a public interest. As recognized by the Constitution it is a special privilege, designed to serve the public purpose of promoting the "Progress of Science and useful Arts." At the same time a patent is an exception to the general rule against monopolies and to the right of access to a free and open market. Monsanto Co. v. Rohm & Haas Co. (CCA 3, 1972), 456 F.2d 592, 598. A patent is a species of property, and gives the patentee exclusive right to make, use and vend the invention of discovery for a limited period. That is to say, it carries for the statutory period "a right to be free from competition in the practice of the invention." Transparent-Wrap Machine Corporation v. Stokes Company (1947), 329 U.S. 637, 643, 67 S.Ct. 610, 614, 91 L.Ed. 563. Each patent gives its owner a monopoly in respect to its disclosures, so much and no more. It is the grant of the exclusive right to manufacture, use and sell the invention which it discloses and the particular invention is what the patent grant protects by the monopoly, not that invention plus some embellishment, improvement, or alternate product or process which also happens to be patented. Motion Pictures Patents Co. v. Universal Film Co. (1917) 243 U.S. 502, 511–513, 37 S.Ct. 416, 61 L.Ed. 871; American Securit Co. v. Shatterproof Glass Corp., 268 F.2d 769, 777 (3rd Cir. 1959). A patent is not the granting of a right to make, use or sell, a grant is only the right to exclude others from making, using or selling the patented device (see 35 U.S.C. § 154, infra.). A patent is a legitimate monopoly having as its primary purpose the advancement of the arts and sciencies rather than reward to the individual. It is not a certificate of merit, but an incentive to disclosure. Valmont Industries Inc. v. Yuma Manufacturing Co. (D.Colo.1969), 296 F.Supp. 1291, 1294. The patent privilege and the reason for its existence leads to the concept of enforcement of this right. Recognizing that the patentee is granted this exclusive right insofar as his invention is concerned, the "heart of his legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent." Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 135, 89 S.Ct. 1562, 1583, 23 L.Ed.2d 129 (1969).

■ The question narrows to "upon what date, under the patent processes of France, did ARCT gain the rights which the very nature of a patent includes and envisions." It affirmatively appears to this court that those inventor's exclusive rights which a patent envisions, accrued on the delivery (delivré) date. On that date the inventor-patentee could sell, trade, publish or otherwise do as he wished. The seal of the ministry was affixed and the making known to the public was a matter which did not impede, change or otherwise limit the right granted on the delivery (delivré) date. Of doubtful authority because of its ancient vintage by virtue of the changes in the French patent law, is Sirocco Engineering Company v. B. F. Sturtevant Co. (CCA 2, 1914), 220 F. 137, 143. There the court in speaking on the question of when the process was patented in France said:

No patent can issue here for that which is patented in a foreign country, and it is patented there the moment it is sealed or enrolled. Ireson v. Pierce (C.C.) 39 F. 795.

■ Of value to this discussion is General Electric Co. v. Hygrade Sylvania Corp., 61 F.Supp. 476 (S.D.N.Y. 1944), wherein, in construing the effective date of a Belgian patent, the court was constrained to hold that the date Phillip's invention was patented in Belgium was the date of the decree issuing the patent, which was November 30, 1928, and not the date of publication, January 19, 1929. To the same effect is Sun Rubber Co. v. National Latex Products Co., 148 F.Supp. 469, 470 (N.D.Ohio 1957), wherein, in construing time for the application of 35 U.S.C. § 102(b), the court said that an Italian invention was "patented" on the date the patent was granted in Italy, notwithstanding that the patent was not printed until a later

date.[9] In Ritter v. Rohm and Haas Company (S.D.N.Y.1967), 271 F.Supp. 313, 317, in construing the meaning of the word patented under the French law, the court stated:

> There is no dispute that, in France, all the rights of a patentee accrued to him on the "delivré" date of his patent. On that date the Ministry of Industry grants the application by signing a decree. Soon afterward the Patent Office notifies the applicant. As of the "delivré" date, the patentee acquires a monopoly right to exclude others and he can sue for infringement. However, unlike American patents, French patents are not published on the same day they are granted. Here, the fact that the Farbe application had been granted was not published in the Bulletin Officiel de la Propriete Industrielle (the "BOPI") until July 6, 1945 and the text of the patent was not published in printed form until August 28, 1945.

Of significant note in the application of this case to the facts before us is the fact that under 35 U.S.C. § 102(d) there is no requirement of "availability to the public." Such requirement has been ascribed to 35 U.S.C. § 102(a) and 35 U.S.C. § 102(b).

 Defendant urges upon the court that the provisions of 35 U.S.C. § 102(b) and 35 U.S.C. § 102(d) are, in effect, the same. If such were true, the necessity for 35 U.S.C. § 102(d) would be eliminated. This court has already noted that 35 U.S.C. § 102(b) makes specific reference to publication while there is a patent absence of any reference to publication in 35 U.S.C. § 102(d). A careful reading of §§ 102(a) and 102(b) as contrasted with § 102(d) discloses that the former are concerned with patent applications in this country by persons other than the person holding the patent in a foreign country. Section 102(d) however is indisputably addressed to the inventor or his representative who has filed an application and been granted a patent in a foreign country, and then endeavors to patent the *same invention* in this country. Viewed in this light, it becomes clear that the omission of any reference to publication in § 102(d) is a meaningful omission, as the inventor or his representative would have knowledge of the issuance of the patent without any general publication. The requirement of publication in § 102(a) and § 102(b) is clearly to insure that persons, *other than the inventor or his representative*, are given notice of the existence of the patent.

Defendants also urge upon the court reasoning applied in cases involving secret registrations. Such is Ex Parte Weiss (Patent Office Board of Appeals, 1967), 159 U.S. Patent Quarterly 122, In re Ekenstam, 256 F.2d 321, 45 CCPA 1022, and other similar cases. This court does not have, in this case, an issue of secret registration. The line of cases is not controlling.

In this case, the French inventor received from the foreign country the exclusive privilege that his laws provided for on the delivery (delivré) date of each French patent. Therefore, the American invention, in each instance, was first patented or caused to be patented by the applicant, or his legal representatives or his assigns in a foreign country prior to the date of the application for patent in this country on an application filed more than twelve months before the filing of the application in the United States. The American patentee was not entitled to the patent issued him in each instance. Because of the provisions of 35 U.S.C.A. § 102(d), each of the American patents is invalid.

The motion to declare invalid the two American patents 3,382,656 and 3,137,-119, is granted.

This court will, at some future date, set a hearing and hear counsel on the question of attorneys' fees, damages and related issues.

And it is so ordered.

9. While this case discusses a ruling under Section 102(b) of Title 35 nevertheless the reasoning would be more appropriate for Section 102(d).

## APPENDIX A

*French Patent 1,427,001 ** *United States Patent 3,382,656*

It is known how to texturize synthetic yarns on false twist frames, i. e., comprising spindles giving the yarns a false twist which goes back up in the heating elements, assuring the setting of the false twist upon further cooling. This texturizing process has been greatly developed in recent years and at the same time the necessary equipment has undergone a considerable evolution.

In one of the systems used in this field the yarns undergo heating in contact with stationary convex metal heating elements. Initially, hollow elements had been provided with interior circulation of a fluid heated to a regulated constant temperature. Then, electric current also was used with suitable regulation. The device used was first a curved metal channel, called "umbrella ribs," itself constituting the electric resistance heated by Joule effect. Then this channel was replaced by a curved metal tube previously mounted in an electric resistance. The tubes had the advantage of an easier thermal insulation. All the tubes were joined in series and were carefully calibrated to assure a constant temperature from tube to tube.

To measure the temperature and for its regulation, at least one of the tubes of the frame was free of yarn and contained a thermal probe connected to control and regulating instruments.

The object of the present invention is a heating tube for false

It is known to texture synthetic filaments on "fals-twist" spinning frames, i. e., spinning frames comprising spindles which impart to the filaments a false twist which progresses backwards into a heating element, which set the false twist on subsequent cooling. This texturing method has been very greatly developed in recent years and the equipment required has at the same time undergone a considerable change.

In one of the systems employed in this field, the threads undergo the heating in contact with fixed convex metallic heating elements. Initially, hollow elements were provided through which there was circulated a fluid heated at a regulated constant temperature. Subsequently, electric heat was employed also with appropriate adjustment. The device employed was first of all a bent metallic channel, called an "umbrella rib," which constituted in itself the electric resistor heated by the Joule effect. This channel was later replaced by a bent metallic tube connected as before as an electric resistor. Tubes had the advantage that they were more readily thermally insulated. All the tubes were connected in series and were carefully calibrated to ensure a constant temperature from tube to tube.

For measuring the temperature and for adjusting it, at least one of the tubes of a spinning frame was free from filament and contained a temperature probe connected to monitoring and adjusting instruments.

The object of the present invention is to provide a heating

---

* As translated by Harvard Translating & Editorial Service, 927 Fifteenth Street, N.W., Washington, D.C. 20005, [Exhibit 638–B].

twist frames with a section with several lobes subdividing the tube into several twin channels, one channel containing an electric, elastic probe, whereas the other channels permit the passage of the yarns to be heated. Each active channel is part of a work position with the other usual elements, i. e., particularly, a delivery reel, delivery rolls, a false twist spindle and a receiving reel.

The invention extends not only to the curved tubes with direct electric heating by resistance, but also to the straight tubes. Heating can also be indirect. In any case, the invention is in no way limited to the following embodiment, but covers any variant in the same spirit. The purpose is a heating element with several parallel channels one of which contains a thermal probe, whereas the others serve for passage of the yarn, the probe being under the same thermal conditions as the yarns.

The system further has the advantage of permitting the multiplication of the production of frames which is obviously governed in the first place by the number of yarn passage channels. With tubes having a section with three lobes, production is doubled for the same working rate. Another advantage is that each working position can be controlled effectively in regard to the thermal conditions.

The example of embodiment will make it possible to understand better the invention which is illustrated by the hypothetical drawing on the accompanying sheet.

In the drawing, there is shown an embodiment with a tube having

tube for "false-twist" spinning frames having a cross-section comprising a number of lobes subdividing the tube into a number of coupled channels, one channel containing a resilient electric probe, while the other channels permit the passage of filaments to be heated. Each active channel forms part of an operating position with the other usual elements, i. e., notably a supply reel, delivery members, a false-twist spindle and a take-up reel.

The invention not only includes bent tubes directly, electrically heated by resistance, but also straight tubes. The heating may also be indirect. In any case, the invention is in no way limited to the following embodiment, but covers any variant in the same spirit. The object is to provide a heating element comprising a number of parallel channels, one of which contains a temperature probe, while the others serve for the passage of filament, the probe being subjected to the same thermal conditions as the filaments.

In addition, the system has the advantage that it permits multiplication of the output of the spinning frames, which is obviously primarily determined by the number of channels for the passage of filament. With tubes having a cross-section comprising a plurality of lobes, particularly three lobes, the output is doubled for the same working speed. Another advantage is that each working position may be effectively controlled in regard to the thermal conditions.

The embodiment will enable the invention, which is illustrated by the diagrammatic drawing on the accompanying sheet, to be more readily understood.

In FIGURE 1, there is illustrated an embodiment compris-

a 3-lobe section, like a clover leaf. Such a tube can be obtained by passage of a larger tube in a suitable die, deforming the tube.

The tube of the example, shown in section, comprises 3 channels 1, 2, 3, connected by diaphragms 4, 5, 6, created upon deformation of the initial tube. These diaphragms can be closed by complete locking of the opposite partitions, as in the section shown, but it is not obligatory.

Channel 1 contains a thermal probe connected to control and regulation apparatus making it possible to check the temperature of channel 1 at each moment and to keep it in narrow predetermined limits.

Channels 2 and 3 contain yarns 8 and 9, undergoing heating.

In direct heating by resistance of the tube the temperature is the same everywhere, except for losses by radiation, which can differ slightly, by the three channels, if the thermal insulation is not absolutely uniform.

ing a tube having a three-lobe or "clover leaf" cross-section. Such a tube may be obtained by passing a larger tube through an appropriate die by which the tube is deformed.

In FIGURE 1, the tube of the example, which is illustrated in section, comprises three channels 1, 2 and 3 connected by diaphragms 4, 5 and 6 created in the deformation of the initial tube. These diaphragms may be closed by complete clamping of the opposed partitions, but this is not essential. *Each of the plurality of lobes or tubes may, of course, constitute separate tubes that are interconnected by a good heat conducting means, such as copper or alloy, or equivalent heat conducting metal means.*

The channel 1 contains a temperature probe connected to monitoring and adjusting devices for checking the temperature of the channel 7 at each instant and maintaining it between predetermined narrow limits.

The channels 2 and 3 contain filaments 8 and 9 which undergo the heating.

In the direct resistance heating of the tube, the temperature is the same throughout, subject to losses by radiation, which may differ slightly in the same channels, if the thermal insulation is not absolutely uniform.

*Referring to FIGURE 2 of the drawing, the filaments 10 and 10' pass from the cones 11 and 11' through guide means 12 and 12' and then through parallel lobes 13 and 13', which in the form shown is curved so that the filaments contact the surfaces of the tubes as they are fed therethrough. In some instances, however, the tubes may be made straight instead of curved and the filaments be caused to contact the*

sides of the tubes by suitable guide means. The heating tubes that comprise lobes 13 and 13' are connected to tube 14 through heat transfer means 16 with terminals 15 which are connected to a suitable source of electric current for heating the tubes by resistance effect. Lobes 13 and 13' are preferably interconnected by a heat transfer means that is preferably made of the same metal as the lobes, so as to have the same resistance, and is preferably made from a metal known for its high resistance properties, for example, of nickel chrome alloy or metals or alloys of a lower resistance. The applied current is preferably low. The heater tubes 13 and 13' are interconnected by heat transfer means 16. The tubes may be thermally insulated at least in the areas where the tubes are not connected by enclosing them in a larger tube 17 and 17' which are cut away to allow the heat transfer means 16 to be joined to the heater tubes, and are lined by an insulating material, for example, vermiculite which fills the space between the inner wall of the large tubes and surfaces of the heater tubes or resistor tubes 13 and 13'. The ends of the large tube 17 are closed by disc 18 and 18', for example, by a plastic material with an orifice the size of the diameter of tube 13 and 13'.

The filaments after passing through the tubes 13 and 13' are fed through false twist spindles 9 and 18' which are rotated by simple means indicated as a belt 20 and is adapted to produce a twist in the filament which feeds back on the filament towards the heating tubes 13 and 13' until arrested by contact with the filaments with the surfaces of such tubes. The temperature of the tubes 13 and 13' is adapted to heat the filaments for setting the false

838

*twist. Finally, the filaments 10 and 10' pass through a guide 21 and 21' and are then wound onto spools 22 and 22'. Therefore, by means of this invention at least two yarns and actually many more may be advanced through adjacent parallel lobes of a single tube, or through adjacent individual tubes that are interconnected by a suitable heat transfer means with a means located in an adjacent tube that is also connected by heat transfer means to each of the said other lobes or tubes for measuring and controlling temperature throughout the heater tube system.*

(The invention can further comprise the following elements separately or in any combinations:

a. The tubes can be heated by any means;

b. Direct or indirect electric heating is used;

c. The tubes can be straight or curved;

d. Particularly, use is made of a curved tube, with direct heating by resistance with a 3-lobe section, with or without intermediate partitions. [*This section contained as paragraph two of Claim 1. in French Patent 1,427,001.*])

The invention may comprise in addition the following elements singly or in any combination:

(a) The tubes may be heated by any means.

(b) Direct or indirect electric heating is employed.

(c) The tubes may be straight or bent.

(d) There is employed notably a bent tube directly heated by resistance and having a cross-section comprising three lobes, with optionally partitioned intermediate diaphragms.

*Each of the individual yarns that are processed by the method and apparatus of this invention may be false twisted by individual spindles or by a single spindle that twists a number of yarns. In the second case, a special yarn guide means is needed so that the plurality of yarns are properly fed into the false-twist spindle.*

CLAIMS

1. Improvement in false twist frames for texturizing of synthetic yarns and remarkable in that the frames comprise heating

Having thus described the invention, what is claimed is:

1. In a false-twist apparatus for the crimping of a textile yarn including delivery means for advancing the yarn from supply to

of tubes with several lobes, forming multiple parallel channels one of which contains a thermal probe, connected to control and regulating apparatus, whereas the others serve for the passage of the yarns to be heated individually for setting of the false twist applied by individual spindles upstream from the tubes.

The invention can further comprise the following elements separately or in any combinations:

a. The tubes can be heated by any means;

b. Direct or indirect electric heating is used;

c. The tubes can be straight or curved;

d. Particularly, use is made of a curved tube, with direct heating by resistance with a 3-lobe section, with or without intermediate partitions.

2. False twist frames for texturizing of synthetic yarns and with productivity multiplied by the fact of the simultaneous passage of several yarns in heating tubes, subdivided into twin individual channels.

takeup and between said delivery means, twisting means and heat setting twist within the yarn, respectively the improvement comprising a heating tube having at least three lobes forming multiple parallel channels, each connected by a heat transfer diaphragm, one of said lobes containing a temperature probe, and at least two other of said lobes serving as passageways for individual filaments, resistance electrical heating means for heating filaments disposed within said lobes, whereby the filaments are individually heated for setting the false twist applied by an individual spindle downstream of the tube.

2. The apparatus of claim 1 wherein the heater tube is arcuate in shape.

3. The apparatus of claim 1 further characterized in that the tube is straight.

4. The apparatus of claim 1 wherein the heater tube is comprised of at least four lobes.

References Cited

UNITED STATES PATENTS

2,803,108 8/1957 Stoddard et al. 57—34 XR

2,864,229 12/1958 Seem et al. 57—34

2,869,312 1/1959 Van Dijk 57—34

2,891,375 6/1959 Van Damme et al. 57—34

3,289,400 12/1966 Scragg 57—34

FOREIGN PATENTS

824,942 12/1959 Great Britain.